**THERESA BOWEN,**

      **Plaintiff,**

v.

      **Civil Action No. 1:05CV158**
      **(The Honorable Irene M. Keeley)**

**MICHAEL J. ASTRUE,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on a document filed by Plaintiff, which was untitled, and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Theresa Bowen ("Plaintiff") filed an application for DIB on July 7, 2003, alleging disability since July 8, 2002 due to tendonitis, bursitis, carpal tunnel, nerve impingement of neck, post status

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

right acromioclavicular (AC) joint clavicle arthroplasty, arthritis, inflamation, and asthma (R. 55, 58, 83). Plaintiff's application was denied at the initial and reconsideration levels (R. 36, 37). Plaintiff requested a hearing, which Administrative Law Judge Steven Slahta ("ALJ") held on October 25, 2004 (R. 1177-1225). Plaintiff, represented by counsel, testified on her own behalf (R. 1180-1220). Also testifying was Vocational Expert Dr. Lawrence Ostrowski ("VE") (R. 1220-1225). On December 30, 2004, the ALJ entered a decision finding Plaintiff was not disabled and retained the residual functional capacity to perform some sedentary work (R. 15-28). On February 4, 2005, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 11). On October 11, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 8-10).

## II. FACTS

Plaintiff was born on October 25, 1972, and was thirty-two years old at the time of the administrative hearing (R. 55, 1180). She has a high school education and past relevant work as a real estate salesperson, sales representative, telephone solicitor, flea market staffer, window company laborer, and nurse's assistant (R. 1180-83).

On June 6, 2001, Plaintiff presented to J. Patrick Galey, M.D., with complaints of painful right shoulder since July 24, 2000. Dr. Galey ordered a MRI of Plaintiff's shoulder (R. 133).

Plaintiff's June 16, 2001, MRI of her right shoulder showed a "tear supraspinatus tendon with fluid in the subdeltoid bursa" (R. 130).

On June 25, 2001, Dr. Galey examined Plaintiff. He noted the MRI showed a "small tear of the rotator cuff." Dr. Galey observed tenderness on palpation and that Plaintiff's range of motion was limited. Her motor and neurological exams were normal. Dr. Galey diagnosed "impingement

2

syndrome right shoulder with small rotator cuff tear." He injected Plaintiff with cortisone and instructed her to return in one week (R. 128).

On July 2, 2001, Dr. Galey referred Plaintiff to Dr. Matthew Darmelio for treatment and care (R. 176).

On August 8, 2001, Plaintiff presented to Doyle R. Sickles, M.D., with complaints of right shoulder pain. Plaintiff informed Dr. Sickles the injection of cortisone given to her by Dr. Galey made her condition worse and that she had been "worsening over time." Plaintiff stated Ultram was "about the only thing that . . . helped . . . keep the pain down." Dr. Sickles noted Plaintiff was "otherwise healthy." Plaintiff complained of tenderness at the AC joint in her right shoulder but no tenderness over the supra or infraspinatus. Plaintiff had "full forward elevation to 140" degrees. Plaintiff had full abduction and full external rotation. Plaintiff had great strength with external rotation and was neurovascularly intact. Plaintiff's cervical motion was good. Dr. Sickles noted Plaintiff's right shoulder x-ray was negative for any bony pathology. He reviewed her MRI and opined he "believe[d] she [did] not have a cuff tear." Dr. Sickles diagnosed AC joint problem and recommended cortisone injection for treatment (R. 174, 177).

On September 13, 2001, Plaintiff was examined by Matthew Darmelio, M.D. She complained of tenderness at the AC joint. Plaintiff had a positive AC compression test, a negative impingement test and negative rotator cuff weakness. Dr. Darmelio provided Plaintiff a cortisone injection as treatment for her condition. He found Plaintiff was temporarily totally disabled until he reevaluated her on October 17, 2001 (R. 172).

Plaintiff received physical therapy from Travis Physical Therapy & Sports Medicine on October 1, 2, 4, 8, 10 and 15, 2001 (R. 141-42).

On October 17, 2001, Dr. Darmelio referred Plaintiff to Gregg O'Malley, M.D., for a second opinion as to whether Plaintiff's condition was related to her AC joint or rotator cuff tear (R. 170).

On October 17, 2001, Dr. Darmelio completed a form for the Workers' Compensation Division, on which he noted he had diagnosed Plaintiff with arthritis and that she could return to full time work on October 30, 2001 (R. 169).

On October 30, 2001, Dr. O'Malley corresponded with Dr. Darmelio relative to Plaintiff's right shoulder. Dr. O'Malley wrote Plaintiff's examination revealed negative Spurling's test and tenderness to palpation over several trigger points in the medial border of the scapula. Dr. O'Malley did not locate any masses. He observed no spasm in Plaintiff's trapezius muscle. Plaintiff's AC joint was symptomatic to palpation and cross body adduction. Plaintiff's rotator cuff strength was good and there was no sign of shoulder instability. Dr. O'Malley observed mild positive provocative tests for carpal tunnel syndrome and positive Tinel's signs in both carpal tunnel areas. Plaintiff's Phalen's tests were positive in both carpal tunnels (R. 167). Dr. O'Malley opined Plaintiff's symptoms were not related to her shoulder but to carpal tunnel syndrome. He recommended Plaintiff cease smoking and return to therapy for range of motion and stretching. Dr. O'Malley felt Plaintiff may "benefit from some trigger point injections" and "injecting the carpal tunnel with Depo-Medrol and ½% Marcaine." Dr. O'Malley opined Plaintiff did not require rotator cuff surgery, but may require carpal tunnel release in the future. Dr. O'Malley informed Plaintiff he did not "see anything dangerous that would preclude her being able to work" (R. 168).

On November 6, 2001, Dr. O'Malley noted he had spoken to Plaintiff on the telephone. He wrote Plaintiff was hostile and Plaintiff "insisted that [he] told her that she did not have a rotator cuff tear but then [he] turned around and pointed to her MRI and said here's a small tear on your rotator

cuff. . . . She also quoted me as saying that MRI's are useless and I should throw it in the trash. . . . She's pretty angry with me for some reason. She indicated that she is going to followup with Dr. Galey which I think is more appropriate . . . since she is not very pleased with my care" (R. 127).

On November 14, 2001, Plaintiff was again examined by Dr. Darmelio. He noted Plaintiff "doesn't have a positive impingement test." He also noted Plaintiff had a "mildly positive AC compression test and tenderness over the AC joint." Dr. Darmelio found Plaintiff had good strength with external rotation and abduction. He reviewed her MRI and "couldn't really see that she had a tear of the supraspinatus." He opined he thought Plaintiff had "AC joint arthrosis" (R. 166).

On January 2, 2002, Dr. Sickles opined Plaintiff could not return to work until February 25, 2002, due to a cervical sprain (R. 165).

On January 30, 2002, Dr. Darmelio examined Plaintiff. He noted she was scheduled for an AC joint resection on February 7, 2002, and had good relief from the cortisone injections into her AC joint. Dr. Darmelio observed Plaintiff had a negative impingement test for rotator cuff and good strength with the rotator cuff musculature. He also observed Plaintiff had a positive AC compression test with tenderness (R. 164).

Plaintiff underwent a right shoulder arthroscopic acromioclavicular joint resection on February 7, 2002. This procedure was performed by Dr. Darmelio (R. 162). There were no complications (R. 163).

On February 27, 2002, Plaintiff presented to Dr. Darmelio for post-surgery follow up. Plaintiff stated she was "doing better since surgery, but her thumb" was "still hurting her." Dr. Darmelio observed Plaintiff had ninety degrees of forward elevation and abduction of the shoulder, had full elbow motion, could make a full fist, and had a little tenderness in the thenar muscle but not

in the joint. Dr. Darmelio took an x-ray of Plaintiff's AC joint resection and observed "it look[ed] excellent." He also x-rayed Plaintiff's hand and thumb and did not observe "any foreign body, fracture, or arthritis." His diagnosis was for "status post right AC joint resection doing better; right hand sprain and thumb pain of unknown etiology." Dr. Darmelio referred Plaintiff to physical therapy for range of motion and strengthening. He expected Plaintiff to return to work on April 15, 2002 (R. 161).

Plaintiff received physical therapy at Travis Physical Therapy & Sports Medicine, Inc., on March 6, 11, 13, 15, 19, 20, 21, 25, and 26, 2002 (R. 137-38).

On March 27, 2002, Plaintiff was examined by Dr. Darmelio. She reported having undergone "aggressive strengthening" at physical therapy, which made her condition worse. Her left shoulder and her right elbow were "bothering" her. Plaintiff reported "clicking" in her right elbow. Dr. Darmelio observed Plaintiff's right shoulder had a forward elevation of one-hundred and twenty degrees, active abduction of one-hundred and fifteen degrees, external rotation of sixty degrees, and internal rotation was "T10." Dr. Darmelio observed "a little tenderness at the AC joint and with AC compression test" at Plaintiff's left shoulder. Dr. Darmelio changed her physical therapy and opined she was temporarily totally disabled until May 1, 2002 (R. 160).

On April 2, 2002, Charles A. Lefebure, M.D., completed an Independent Medical Evaluation of Plaintiff for Workers' Compensation (R. 448). Plaintiff complained of "aching pain in the posterior shoulder, radiating to the anterior aspect of the upper arm and down the medial side of the arm and forearm." Plaintiff stated any type of activities were "somewhat painful." Plaintiff informed Dr. Lefebure that she had "regained good motions of the shoulder, but her strengths [were] weak, and [she] [was] unable to do a lot of her daily routines, especially lifting or reaching above

6

her head . . . ." Plaintiff stated she was "bothered in every type of her daily activities, sleeping, walking, household duties, [could] do her activities of daily living, but with some discomfort, but [did] not lift heavy objects or push or pull." Plaintiff stated she could drive a car, but not for long distances. Plaintiff stated she could not ride an ATV, bowl or shoot pool due to her shoulder symptoms (R. 459).

Dr. Lefebure's physical examination revealed Plaintiff was twenty-nine years old, was five feet tall, and weighed one-hundred, forty pounds. Plaintiff's gait was without disturbance. Plaintiff's cervical spine range of motion was "rather good" (R. 459). Plaintiff's right shoulder motions were "performed reasonably well, with some discomfort." Plaintiff's right shoulder abduction was 130 degrees; adduction was sixty degrees; forward flexion was 140 degrees; extension was forty degrees; internal rotation was ninety degrees; and external rotation was one-hundred degrees. Dr. Lefebure observed Plaintiff had "reasonably good strengths" in her right shoulder, and it did not appear to be "unstable." Dr. Lefebure recommended Plaintiff continue with physical therapy (R. 460).

On April 3, 5, 8, 9, 11, 15, 18, 22, 24, 26, and 29, 2002, Plaintiff reported to Mark Pinti for physical therapy (R. 183, 189, 192, 197).

On April 23, 2002, Plaintiff reported to Dr. Darmelio that she had attempted to return to work. She had done overhead work. She had missed three days of work. She had repored to the emergency room for a "pain shot." Plaintiff reported neck and scapular pain, pain in both shoulders, elbow pain, and numbness in her right little finger. Dr. Darmelio informed Plaintiff they had "to keep her working." He limited her to no overhead work and recommended office work. He instructed Plaintiff to return in six to eight weeks and to continue therapy on her own. Dr. Darmelio

opined Plaintiff was not temporarily totally disabled (R. 157, 159).

Also appearing on the April 23, 2002, office note of Dr. Darmelio, is an entry that Plaintiff was told two times about a job opening in "s.service when she was initially released" to work. It was noted her "husband also told was not interested. Said she couldn't do office work." Plaintiff's work was modified to require her to "do in-pins only;" another worker would hang the spacers after the grids were in place (R. 159).

On May 4, 2002, Plaintiff presented to Dr. Lauderman with complaints of right shoulder pain and right elbow pain (R. 646). She was prescribed Naprosyn and instructed to rest. Plaintiff was instructed to get x-rays of her shoulder and elbow (R. 647).

On May 4, 2002, x-rays were made of Plaintiff's cervical spine; the results were normal. They showed normal vertebral bodies and disc spaces. No fractures were seen. The posterior elements and pre-vertebral soft tissues were unremarkable (R. 650).

Also on May 4, 2002, x-rays were taken of Plaintiff's right elbow; the results were normal. No significant osseous abnormalities were seen. The joints and soft tissues were within normal limits (R. 649).

On May 7, 2002, Plaintiff presented to Dr. Darmelio. She was sent there by Doctor's Quick Care, where she initially presented, complaining of bilateral shoulder pain. Dr. Darmelio informed Plaintiff that she could perform her job with the limitations that were in place and that she was not temporarily totally disabled. Dr. Darmelio informed Plaintiff he could not "justify keeping her off work" and that Plaintiff could "seek to find another physician to care for her" . . . "if she is unhappy with" the care he was providing her. He noted Plaintiff was "very angry . . . and left the Clinic." Dr. Darmelio memorialized this in a letter to West Virginia Workers' Compensation (R. 156).

On May 10, 2002, Plaintiff had a cervical spine x-ray taken. It showed a "tilt of the cervical spine to the right." It also showed "straightening of the cervical lordosis with anterior carriage of the head." Rotational malposition was noted at C2 and "lack of motion between occiput/C1 on flexion" was also noted. No fracture, dislocation, osseous, or joint pathology was observed (R. 642).

On May 13, 2002, Plaintiff received physical therapy from Mark Pinti (R. 183).

On May 14, 2002, Plaintiff received chiropractic treatment from Tarrin P. Lupo, D.C. (R. 346-47).

On June 3, 4, 5, and 6, Plaintiff received chiropractic treatment of her shoulder, neck, fingers, and elbow from Dr. Lupo (R. 338-39).

On June 4, 2002, Plaintiff presented to Thomas Lauderman, D.O., at Doctor's Quick Care, for a refill of her Neurontin. She was prescribed Neurontin 300 (R. 640-41).

On June 9, 2002, Plaintiff reported to the Emergency Department of United Hospital Center after hitting a deer with her car. The CT Scan of her head revealed no fracture and was normal (R. 327-28).

On June 12, 2002, Plaintiff presented to Dr. Lauderman with complaints of "chronic & acute pain." She reported having been in a motor vehicle accident on June 9, 2002. She informed the attending physician that she had visited a doctor of chiropractic medicine the previous day and had been diagnosed with whiplash. She stated she "need[ed] rechecked to see if she [could] go back to work" (R. 635). She was diagnosed with cervical strain (R. 636).

On June 13, 14, 17, 18, 19, 20, 21, 25, 27, and 28, 2002, Plaintiff received chiropractic treatment for neck, shoulders, arms, hands, and fingers from Dr. Lupo (R. 294-95, 296-97, 298-99, 301-02, 303-04, 305-06, 307-08, 309-10, 311-12, 313-14).

9

On July 1, 2002, Plaintiff presented to Dr. Lauderman for refills on her medications. She was prescribed Zanaflex (R. 633-34).

On July 1, 2, 3, 9, 10, 12, 15, 16, 17, 18, 19, 22, 24, 26, 29, and 31, 2002, Plaintiff received chiropractic care for shoulders, neck, hands, and elbows from Dr. Lupo (R. 288-91, 286-87, 284-85, 280-81, 278-79, 276-77, 274-75, 272-73, 270-71, 265-66, 262-63, 260-61, 258-59, 256-57, 254-55).

On July 18, 2002, Plaintiff presented to Dr. Lauderman with complaints of right shoulder pain. She stated physical movement exacerbated her pain; her current medication was "not working;" and that Neurontin "help[ed]" (R. 628-29). Plaintiff was prescribed Neurontin 300mg (R. 630).

On July 18, 2002, a x-ray was made of Plaintiff's cervical spine. The impression was for straightening of the lordotic curvature and restricted motion at C2-C7 (R. 264).

On August 1, 5, 7, 8, 13, 14, 16, 20, 23, 26, 27, and 30, 2002, Plaintiff received chiropractic treatment for neck, shoulders, arms, hands, and fingers from Dr. Lupo (R. 217-18, 219-20, 221-22, 223-24, 225-26, 227-28, 228-29, 230-31, 234-35, 244-45, 246-47, 248-49).

On September 3 and 5, 2002, Plaintiff received chiropractic care from Dr. Lupo (R. 213-15).

On September 5, 2002, a motion x-ray was made of Plaintiff's right shoulder. It showed "decreased abduction to 155 degrees." The impression was for "normal DMX of the right and left cervicothoracic junctions" (R. 212).

On September 6, 2002, Plaintiff had an MRI examination of her right shoulder. It showed "partial-thickness, bursal-sided supraspinatus tendon tear;" mild subacromial bursal fluid that was consistent with bursitis; and postoperative changes (R. 208).

Also on September 6, 2002, an MRI examination was made of Plaintiff's cervical spine. It

10

was normal with no disc herniations, bulging, or osteophyte formations. Her spinal cord was normal (R. 209).

On September 9, 11, 12, and 16, 2002, Plaintiff received chiropractic treatment for her shoulders, arms, hands neck, elbows by Dr. Lupo (R. 202-03, 204-05, 206-07, 210-11).

On September 30, 2002, Plaintiff was examined by J. M. Dauphin, M.D., to obtain another opinion about her supraspinatus tendon tear. Plaintiff reported to Dr. Dauphin she had been injured at her job, had undergone arthroscopic distal clavicle resection, had done well postoperatively, had received chiropractic care from Dr. Lupo, and had undergone a repeat MRI that showed a "small tear." Dr. Dauphin diagnosed Plaintiff with neck sprain and cervicalgia. He opined the "tear seen on the second MRI needs to be repaired." He noted it was "a very small tear and [was] most likely partial thickness and covered by scar." Dr. Dauphin opined Plaintiff needed to be "kept on full-time NSAID and retrained for another type of job." Dr. Dauphin recommended Plaintiff seek a neurological consultation "because of progressive symptoms in arms which are sometimes bilateral, to rule out cervical disc disease." Dr. Dauphin recommended Plaintiff not continue with chiropractic treatment until "after neurosurgical consultation [was] complete." Dr. Dauphin opined Plaintiff would not "return to much overhead type of work" (R. 419).

Plaintiff received chiropractic care for headache, right shoulder pain, mid back pain, and neck pain from Heather A. McCarter, D.C., on October 14, 17, 21, 23, 24, 29, and 31, 2002 (R. 402, 403, 406, 407, 408, 410, 411, 412, 414, 415).

Plaintiff received chiropractic care on November 4, 6, 7, and 11, 2002, from Dr. McCarter (R. 395-99, 401).

On November 11, 2002, Plaintiff presented to Dr. Lauderman for "refills on all meds." It was

noted she was being treated by a "chiropractor for her medical problems" but that "she need[ed] to see neurologist" (R. 392, 625). Plaintiff was prescribed Ultram, Allegra, Neurontin, Zanaflex, and Naproxyn (R. 627).

Plaintiff was treated for headache, right shoulder pain, mid back pain, and neck pain by Dr. McCarter at her chiropractic clinic on November 13, 18, 20, 21,and 25, 2002 (R. 381, 383, 384, 386, 388, 389, 391).

On December 2, 4, 6, 10, 11, 12, and 16, 2002, Plaintiff received chiropractic treatment of her right shoulder, mid back and neck and for headache from Dr. McCarter (R. 370, 371, 373, 376, 378, 379, 380).

On December 18, 2002, a x-ray was made of Plaintiff's right shoulder. It showed decreased abduction to one-hundred, sixty-five degrees and widening of the AC joint (R. 369).

Plaintiff received chiropractic care from Dr. McCarter on December 12, 16, 18, 23, 27, and 31, 2002 (R. 368).

Plaintiff received chiropractic care from Dr. McCarter on January 3, 6, 8, 13, 20, 22, 23, 28, and 30, 2003 (R. 361, 367, 368).

On February 5 and 6, 2003, Plaintiff received chiropractic care from Dr. McCarter (R. 361).

On February 28, 2003, Plaintiff presented to MedBrook with complaints of headache, right side of her head being swollen, and stabbing pain in her right shoulder for the past one and one-half weeks (R. 424). A x-ray made of Plaintiff's spine was unremarkable and showed no acute fracture or subluxation (R. 427, 1016). It was observed that Plaintiff had full range of motion in her neck and shoulder. She complained of tenderness on palpation over her right pericervical muscle, posterior trapezius, and medial aspect of the scapula. Plaintiff was diagnosed with pericervical strain and

12

prescribed Darvocet and Toradol (R. 425).

Also on February 28, 2003, Plaintiff was examined by Michael J. Kominsky, D.C. A nerve test was conducted in both arms and supported a diagnosis of bilateral carpal tunnel syndrome. Dr. Kominsky recommended "reduction in activities associated with repetitive wrist movements" and that Plaintiff wear carpal tunnel splints (R. 464).

On March 7, 2003, Plaintiff presented to the Emergency Department of the United Hospital Center with complaints of back, neck, and shoulder pain. She was diagnosed with trapezius muscle spasm, treated with Toradol and released to home (R. 428).

On March 21, 2003, Plaintiff presented to Dr. Lauderman for a follow-up to her neck "sprain" for Workers' Compensation. Plaintiff stated the pain in her back, shoulder and neck was seven on a scale of one to ten. Plaintiff stated physical activity exacerbated her condition. It was noted Plaintiff had "seen multiple physicians for meds" (R. 622). Plaintiff was instructed she needed an MRI of her cervical spine and to seek the care of Dr. Kennedy for treatment of carpal tunnel syndrome. Plaintiff was prescribed Neurontin, Ultram, and Zanaflex (R. 624). On that same date, Dr. Lauderman opined Plaintiff was temporarily and totally disabled and "unable to perform any physical duties at [that] time." Dr. Lauderman opined Plaintiff would be able to return to work on a trial basis on June 21, 2003 (R. 621).

On March 25, 2003, Dr. Lefebure completed an Independent Medical Evaluation of Plaintiff for Workers' Compensation. Dr. Lefebure reviewed Plaintiff's September, 2002, MRI's of her right shoulder and cervical spine. He noted her cervical spine was normal, but her right shoulder "did show some postoperative changes, consistent with resection of the distal right clavicle." Plaintiff presented with "multiple complaints . . . of the neck, of both shoulders, and numbness of the right

13

elbow, especially at night, with aching pains in the hands, which seem[ed] to be worse with use of her hands . . . . " Plaintiff stated she experienced discomfort in her neck and shoulders when "sometimes sitting, resting." Plaintiff asserted the pain was not radicular, but that she did have elbow numbness. Plaintiff stated she had "aching discomfort in the hands, especially the right, in the region of the thumb and somewhat of the wrist." Plaintiff informed Dr. Lefebure she had been referred to a neurologist. Plaintiff stated she had realized "only temporary relief from her physical therapy and chiropractic treatments" (R. 454).

Plaintiff's cervical spine motions were as follows: flexion was 64 degrees; extension was 18 degrees; right lateral flexion was 14 degrees; left lateral flexion was 24 degrees; right rotation was 58 degrees; and left rotation was 46 degrees. Plaintiff's right shoulder motions were as follows: abduction was 120 degrees; adduction as thirty degrees; forward flexion was 130 degrees; extension was fifty degrees; external rotation was seventy degrees; and internal rotation was eighty degrees (R. 455).

Plaintiff's biceps, triceps and brachioradialis reflexes were brisk in both upper extremities. She had negative Tinel's sign for the median nerve in both wrists. Her Tinel's sign at the median nerve in both wrists was negative. Her Phalen's sign produced some ulnar and median symptoms in her right upper extremity and Plaintiff reported numbness in her little finger and thumb. Plaintiff's Phalen's sign for her left upper extremity was negative. Plaintiff had no thenar atrophy and she had good sensation in her right hand. Dr. Lefebure observed Plaintiff's right wrist and elbow moved smoothly and freely. Plaintiff had a negative Tinel's sign for her ulnar nerve at the right elbow (R. 455).

Dr. Lefebure opined he did not "find evidence of carpal tunnel syndrome by examination.

... [or] evidence of cervical radiculopathy." He noted Plaintiff's symptoms, "although considerable, [did] not seem to fit a particular diagnosis and seem[ed] a bit broad and not specific." Dr. Lefebure opined Plaintiff had not "developed some other complication of her shoulder surgery, or other diagnoses, despite the multiple complaints" (R. 456). Dr. Lefebure opined that he "did not think that there was evidence of underlying cervical spine problems in relation to [Plaintiff's] injury of July, 2000, and would not add additional impairment for the cervical spine" (R. 457).

In conclusion, Dr. Lefebure noted Plaintiff had "had investigations by several physicians over the past years, and [he] could not determine a specific common factor therein, other than her right shoulder, and did not think that by her evaluations here that there were some other underlying diagnosis to explain her continued ongoing symptoms" (R. 457).

On March 29, 2003, Plaintiff presented to United Hospital Center with complaints of neck pain and stabbing pain in her left shoulder (R. 1007). Plaintiff was assessed with acute neck pain and muscular strain and prescribed Darvocet (R. 1004, 1006). Plaintiff was released to home (R. 1007).

On March 30, 2003, Plaintiff had an MRI of her cervical spine. It was normal (R. 617, 1002).

On April 1, 2003, Plaintiff informed Dr. Lauderman her pain was better, but that her hands were "going numb again." Dr. Lauderman noted Plaintiff's symptoms were exacerbated by carpal tunnel syndrome and neck sprain and strain (R. 618). He scheduled Plaintiff for physical therapy and for an examination by Dr. Kennedy in May 2003. Dr. Lauderman prescribed Darvocet (R. 620).

On April 7, 2003, Plaintiff returned to Dr. Lauderman for an examination of her shoulders, neck and middle back. Plaintiff complained of "bad" headaches. She stated her head swelled around her temples. Dr. Lauderman noted Plaintiff's pain was moderate to severe and was

exacerbated by physical activity (R. 612). He noted Plaintiff had a neck strain/sprain and carpal tunnel syndrome, bilateral (R. 613). Dr. Lauderman opined Plaintiff "need[ed] to see neurosurgeon WVU Dr. Bloomfield for neck & back pain" (R. 614).

On April 25, 2003, Plaintiff presented to Dr. Lauderman for a follow up for her Workers' Compensation claim. She stated her elbow was "still going numb" and she experienced trigger points in her shoulder. Dr. Lauderman opined Plaintiff's pain was of moderate severity and was exacerbated by physical activity. Dr. Lauderman noted pool therapy helped Plaintiff's symptoms (R. 606). Dr. Lauderman diagnosed neck sprain/strain and cervicalgia (R. 607). Dr. Lauderman prescribed Darvocet (R. 608).

On April 29, 2003, Plaintiff returned to Dr. Lauderman for a follow up for neck sprain/strain and cervicalgia. Plaintiff complained of a swollen tendon in her right neck and swelling in her temporal regions. Dr. Lauderman noted Plaintiff's condition was exacerbated by stress and her symptoms were moderate to severe (R. 603). Dr. Lauderman diagnosed neck sprain/strain and right arm pain (R. 604). Dr. Lauderman instructed Plaintiff to return on May 23 (R. 605).

On April 29, 2003, Dr. Lauderman corresponded with West Virginia Workers' Compensation and requested that Plaintiff be permitted to continue with her aquatic therapy. He wrote he disagreed with Dr. Lefebure's opinion that Plaintiff had reached maximum medical improvement; he opined Plaintiff was "showing improvement with her aquatic therapy."

Plaintiff received physical therapy for her right shoulder and cervical spine at Bridgeport Physical Therapy on April 4, 8, 9, 10, 14, 15, 17, 22, 24, 25, and 28, 2003 (R. 543-71).

On May 14, 2003, Plaintiff presented to United Hospital Center with complaints of headache, neck and shoulder muscle spasms, and vomiting. She requested a prescription for Percocet. She was

provided Demerol, Phenergan, and Toradol at the hospital (R. 998).

On May 16, 2003, Plaintiff presented to Dr. Lauderman with complaints of headache, neck and back spasms, vomiting, and having difficulty breathing. It was noted that West Virginia Workers' Compensation denied Plaintiff's request to continue aquatic therapy (R. 599). Dr. Lauderman diagnosed neck strain/sprain and anxiety (R. 600). He prescribed Xanax and instructed Plaintiff to return on May 23, 2003 (R. 601).

On May 22, 2003, Stephen Bloomfield, M.D., evaluated Plaintiff. Plaintiff's chief complaints were neck pain and swelling down both shoulders and into the AC joints. Plaintiff asserted she also had "trigger-point problems in that area that increase[d] with weather and activity." Dr. Bloomfield noted Plaintiff's March 30, 2003, cervical spine MRI was normal. He also noted an earlier EMG nerve conduction study test "demonstrated questionable carpal tunnel syndrome" (R. 593, 594). Dr. Bloomfield concluded the September 6, 2002, MRI of Plaintiff's right shoulder "revealed partial thickness bursa-sided supraspinatus tendon tear and a mild subacrominal bursal fluid consistent with bursitis" (R. 594). Dr. Bloomfield also noted Plaintiff had not been treated at a pain clinic (R. 593).

Plaintiff informed Dr. Bloomfield she had headaches, ear infections, had to "yawn to catch her breath," and the "AC joint clavicular resection" she had undergone was "bothering her." Plaintiff's medications were listed as Darvocet, Ultram, Xanax, Neurontin, Zanaflex, and Motrin (R. 593). Plaintiff described her pain as chronic in her neck and shoulders, headaches, and muscle spasms. Plaintiff informed Dr. Bloomfield she had "repetitive stress injuries to both shoulders and the neck, and also carpal tunnel problems in both extremities, bursitis, tendinitis, and arthritis." Plaintiff stated she smoked one package of cigarettes per day and she denied alcohol abuse (R. 594).

17

According to Dr. Bloomfield's physical examination, Plaintiff weighed 140 pounds and was five feet tall. She was in no acute distress. Her funduscopic examination was normal; her carotid pulses were equal bilaterally with no bruits; her peripheral pulses and circulation in extremities were good; and her neurological examination was normal for higher cortical function, cranial nerve examination, sensory/motor examination, and deep tendon reflexes. Dr. Bloomfield observed "some decreased range of motion in the neck, which [was] mild, and no significant paraspinal muscle spasm." Plaintiff complained of "some significant tenderness to palpation of her right shoulder" (R. 594).

Dr. Bloomfield opined Plaintiff "would best be served by an orthopedic evaluation by a physician, such as Dr. Post, at WVU, who is an expert in the shoulder joint." Dr. Bloomfield wrote he "would like to check another EMG nerve conduction study to see if [Plaintiff] ha[d] carpal tunnel syndrome. However, she does not appear to be symptomatic from it." Dr. Bloomfield recommended Plaintiff be treated at a pain clinic. He opined Plaintiff did not require neurosurgical intervention (R. 594). Dr. Bloomfield reported his findings to Dr. Lauderman on May 25, 2003 (R. 993-95).

On May 23, 2003, Plaintiff returned to Dr. Lauderman. She reported she had consulted Dr. Bloomfield on May 22, 2003. She reported Xanax sometimes helped her sleep better (R. 596). Dr. Lauderman diagnosed neck sprain/strain (R. 597). He referred Plaintiff to a neurologist and instructed Plaintiff to return on June 9, 2003 (R. 598).

On May 29, 2003, Plaintiff presented to Dr. Lauderman with complaints of increased left shoulder pain that went "into neck." She reported her left shoulder was "cracking & popping." She requested prescription drug refills (R. 631).

Upon Dr. Lauderman's referral, Plaintiff received physical therapy for her right shoulder and

cervical spine at Bridgeport Physical Therapy on May 1, 2, 5, 8, 12, 13, 15, 20, 21, 23, 27, 29, and 30, 2003 (R. 505-42).

On June 9, 2003, Plaintiff was examined by Dr. Lauderman. She complained of neck and shoulder pain. She informed Dr. Lauderman her hands were going numb and were cold (R.598). Dr. Lauderman diagnosed neck sprain and strain and right and left shoulder pain (R. 588). He prescribed Klonopin and instructed Plaintiff to return on June 24 (R. 589). Dr. Lauderman completed an Attending Physician's Report, noting thereon that Plaintiff was unable to perform her physical duties as she was temporarily and totally disabled. Dr. Lauderman opined Plaintiff could return to work on a trial basis on September 9, 2003 (R. 585).

On June 23, 2003, Plaintiff returned to Dr. Lauderman for a follow up to her carpal tunnel. She reported her hands were "going numb & cold." She stated she experienced pain in her back, neck, and shoulders. Plaintiff asserted her "elbow [was] getting worse." Plaintiff requested a refill on her prescription medication. It was noted that Plaintiff was "upset with Doctors' Quick Care," the medical group with whom Dr. Lauderman was affiliated, and that they could "not seem to come to an agreement. Have bent over backwards to help this pt." Also noted on the record was the following: "?CTS needs EMG per Dr. Bloomfield" (R. 580). Dr. Lauderman prescribed Darvocet and ordered an EMG of Plaintiff's hands. He noted he had "nothing further to offer this pt and she should secure another physician to assist her" (R. 582).

On June 26, 2003, Dr. Lauderman completed a Diagnosis Update of Plaintiff. He listed the following diagnoses descriptions: "primary, disorder of the tendons in shoulder; secondary, symptoms of back; secondary, pain in neck; secondary, neck sprain/strain CTS" (R. 578).

On June 27, 2003, Dr. Lauderman corresponded with Plaintiff. He informed her that,

"[d]ue to [her] explosive actions toward [his] staff and inability to properly address the staff . . . [he was] discharging [her] from Doctors' Quick Care as of 6/27/2003" (R. 579).

Plaintiff received physical therapy for her right shoulder and cervical spine at Bridgeport Physical Therapy on June 3, 6, 9, 11, 16, 17, 20, 24, 26, 27, and 30, 2003 (R. 470-504).

Plaintiff received physical therapy for her shoulders and cervical spine at Bridgeport Physical Therapy Services on July 2, 7, 8, 9, 11, 15, 17, 18, 21, 23, 25, 28, 29, and 31, 2003 (R. 467-69, 895-933).

On July 9, 2003, Plaintiff presented to MedBrook and requested that Brad Hall, M.D., be her treating doctor. It was noted her chart needed to be "updated for w/c." Dr. Hall's provisional diagnoses were for cervicothoracic strain and rotator cuff "tear/tendonitis" (R. 673).

On July 10, 2003, an initial assessment form was completed on Plaintiff for the West Virginia Pain Treatment Center. She stated she had tendinitis, bursitis, torn rotator cuff, carpal tunnel syndrome, and a pinched nerve in her neck (R. 1113). Plaintiff was diagnosed with cervical sprain/strain (R. 1115).

On that same date, Stanford J. Huber, M.D., of the West Virginia Pain Treatment Center, completed a physical examination of Plaintiff (R. 1125). He found her gait was normal, range of motion was within normal limits, motor strength was 5/5 bilaterally in upper extremities, and intact sensation in upper extremities except decreased sensation in the C7-C8 dermatome (R. 1126). Dr. Huber's treatment plan was as follows: conduct JAMAR test; obtain MRI of brain; provide cervical epidural steroid injections if warranted by MRI results; obtain neurology consult; continue physical therapy; and obtain CT scan of C6-7 and C7-T-1 (R. 1127).

On July 14, 2003, Jack E. Riggs, M.D., performed a neurologic evaluation of Plaintiff. He

communicated his findings to Dr. Lauderman in a letter dated that same day. Plaintiff reported she had been diagnosed with chronic myofascial pain syndrome and had started treatment at a pain clinic, where trigger-point injections were recommended. Dr. Riggs examination revealed "no definite lateralizing or focal neurologic abnormalities." He noted Plaintiff did have "some limitation of motion of the right upper arm, which [was] presumably attributable to her right rotator cuff tear." He found her reflexes were normal active and bilaterally symmetrical. Dr. Riggs' impression was for "orthopedic injuries related to the right rotator cuff tear" (R. 985). Dr. Riggs recommended Plaintiff be assessed by an orthopedist for "loose cartilage in her right elbow," a condition about which Plaintiff complained to Dr. Riggs, and EMG studies to assist him in diagnosing carpal tunnel syndrome, ulnar neuropathy, or cervical radiculopathy (R. 985-86).

Plaintiff's Klonopin, Darvocet, Clonazapam, and Zanaflex were refilled by Dr. Lauderman on July 23, 2003 (R. 576-77).

Plaintiff received physical therapy on her shoulders and her cervical spine at Bridgeport Physical Therapy on August 5, 6, 7, 11, 13, 15, 18, 19, 20, 22, 25, 26, and 27, 2003 (R. 853-94).

On August 20, 2003, John S. Henry, M.D. an orthopedist, corresponded to Dr. Hall relative to the results of his physical examination of Plaintiff. She informed him she had pain in her neck, across both shoulder and down her arms, and numbness and tingling in both her hands, but that most of her discomfort seemed to be localized to the right shoulder. Dr. Henry's physical examination of Plaintiff revealed "[n]ear, full active range of motion" with "notable impingement signs." There was no tenderness over previous site of the AC joint. Plaintiff's rotator cuff strength was four out of five to abduction and external rotation. The x-ray of Plaintiff's right shoulder that Dr. Henry took and reviewed at the examination showed a "satisfactory resection distal clavicle." He reviewed

Plaintiff's September 6, 2002, MRI, and noted it showed "changes consistent with partial thickness bursal side supraspinatus tendon tear as well as post surgical changes of the subacrominal decompression, distal clavicle resection." He reviewed a right upper extremity EMG that Plaintiff had undergone and noted it was "consistent with bilateral carpal tunnel syndrome" (R. 715, 1135). Dr. Henry's impression was for right shoulder rotator cuff syndrome with questionable partial thickness tear of the rotator cuff. Dr. Henry injected Plaintiff's right shoulder with Depo Medrol and Lidocaine. He continued her on Darvocet, Ultram, Neurontin, Clonazapam, and Zanaflex. He recommended she continue with physical therapy. He instructed her to "keep in contact with Dr. Hall," as he was her Workers' Compensation physician. He instructed Plaintiff to return in six weeks (R. 716, 1136).

Plaintiff received physical therapy on her shoulders and cervical spine at Bridgeport Physical Therapy on September 2, 5, 8, 9, 12, 16, 18, 22, 23, 26, and 29, 2003 (R. 817-52).

On September 5, 2003, Plaintiff presented to MedBrook. She requested to "see Dr. Hall about getting workers comp paperwork done" and to obtain "wrists splints for arthretic [sic] pain." Plaintiff also requested refills on her medications (R. 672).

On September 11, 2003, Fulvio R. Franyutti, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 662). Dr. Franyutti found Plaintiff was occasionally limited in her ability to climb, balance, stoop, kneel, crouch, and crawl (R. 663). Dr. Franyutti did not mark degrees of limitations (if any) as to Plaintiff's manipulations (R. 664). Dr. Franyutti found

Plaintiff had no visual or communicative limitations (R. 664-65). Dr. Franyutti opined Plaintiff had no limitations in her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and/or poor ventilation. He found Plaintiff should avoid concentrated exposure to extreme cold and hazards (R. 665). Dr. Franyutti reduced Plaintiff's RFC to light (R. 666).

On September 12, 2003, Plaintiff returned to Dr. Hall at MedBrook. He noted she had had a "[r]ather complex Worker's Compensation case" and "she had been transferred to [his] care recently unbeknownst" to him. Plaintiff requested a refill of her prescriptions for Ultram, Zanaflex, Darvocet, Klonopin, and Neurontin. Dr. Hall noted Plaintiff intended to transfer her care to Dr. Calhoun. Dr. Hall's office notes do not contain any examination records on this date. He assessed cervicothoracic strain with chronic pain, rotator cuff tendonitis, and bilateral carpal tunnel (R. 671).

On September 19, 2003, Dr. Hall corresponded with the West Virginia Workers' Compensation Division. In that correspondence, he expressed he was "unable to accept her care due to the complexity and duration and inability to sort out a very complex case, which has been under the care of multiple physicians including Dr. Lauderman and multiple referrals." Dr. Hall wrote he could not "be her treating physician as not only was [he] not personally able to review the case prior to its acceptance but [he] [felt] that [he] [could] do this patient no justice by being a paperwork shuffler in a case which is so complex involving claim reopenings and additional diagnoses of which [he was] unaware of the facts for the last two years" (R. 749). Dr. Hall requested authorization for Plaintiff's medications (R. 720).

On September 24, 2003, Bruce A. Guberman, M.D., wrote a letter to Thomas P. Maroney, Plaintiff's Workers' Compensation lawyer (see hand-written note R. 725). Dr. Guberman wrote that Plaintiff informed him her right shoulder pain had worsened since the surgery. She reported morning

stiffness, swelling, redness, and warmth throughout the right shoulder (R. 726-27). Plaintiff stated her right arm was weak, especially when carrying or lifting away or overhead or when pushing or pulling with the right shoulder. Plaintiff reported "sharp to dull pain in the cervical spine with radiation into the posterior aspect of the head causing headaches." Plaintiff reported pain that radiated into both shoulders, both arms, numbness, tingling, and weakness in both hands and arms. Plaintiff informed Dr. Guberman that a February 2003 EMG and nerve conduction study confirmed bilateral carpal tunnel syndrome. Plaintiff reported cervical spine pain that often radiated into the thoracic spine and the lumbar spine. Plaintiff reported pain and stiffness in her left shoulder (R. 727).

Plaintiff reported dyspnea on exertion, chronic cough, asthma that is controlled with medication, sharp chest pains that occurred once per month without provocation, intermittent history of high blood pressure due to pain, occasional nausea and vomiting with headaches, intermittent constipation, frequent urination, and occasional light headedness (R. 728).

Plaintiff stated she could no longer ride her ATV, could no longer baby-sit children because she could not lift them, had difficulty driving, and she could no longer bowl (R. 727).

Plaintiff reported she smoked one package of cigarettes per day. Upon examination, Plaintiff's weight was 125 pounds; her blood pressure was 120/60. Plaintiff's gait was normal and stable. Plaintiff appeared to Dr. Guberman to be comfortable in the supine and sitting positions. Dr. Guberman observed Plaintiff's cervical spine was moderately tender but had no paravertebral muscle spasm. He noted decreased cervical lordosis. Plaintiff had tenderness over both trapezius muscles. Plaintiff's flexion was normal to fifty degrees and her extension was limited to forty degrees. Plaintiff's rotation was diminished to sixty degrees bilaterally and her lateral flexion was diminished

24

to forty degrees bilaterally (R. 728). Dr. Guberman noted Plaintiff's right shoulder was tender, especially at the AC joint and the trapezius muscle. He observed no redness, warmth, or swelling. Plaintiff's forward flexion and abduction of her right shoulder were limited to 140 degrees. Extension and adduction of the right should were limited to forty degrees. Internal rotation of the right shoulder was limited to fifty degrees and external rotation was limited to seventy degrees. Plaintiff's left shoulder was mildly tender and was without warmth, redness, or tenderness. Forward flexion and abduction were normal to 180 degrees. Extension and adduction were normal to fifty degrees. Internal and external rotation were normal to ninety degrees (R. 729).

Plaintiff's right wrist and elbow were tender, but were without redness, warmth, or swelling. Plaintiff's elbow flexion was normal to 140 degrees bilaterally; elbow extension was normal to zero degrees bilaterally. Plaintiff's wrist flexion and extension were normal to sixty degrees bilaterally. Plaintiff's hands revealed no tenderness, redness, warmth, or swelling. Dr. Guberman observed no significant range of motion abnormalities in either hand. No atrophy was noted and Plaintiff could make a fist bilaterally. Plaintiff had a positive Tinel's sign bilaterally. No Heberden or Bouchard's nodes were observed. Plaintiff's grip strength was thirty, thirty-two, and thirty kilograms on the right and twenty-eight, thirty, and thirty kilograms on the left. Plaintiff could button and pick up coins with each hand, but with mild difficulty. Examination of Plaintiff's knees revealed no tenderness or crepitations. Extension was normal to zero degrees; flexion was normal to 150 degrees bilaterally. Dr. Guberman observed no tenderness, redness, warmth, or swelling of Plaintiff's ankles or feet. Plantar flexion of her ankles was normal to forty degrees; dorsiflexion was normal to twenty degrees bilaterally (R. 729).

Dr. Guberman noted Plaintiff's spine curvature was normal. Her lumbar spine flexion was

25

sixty degrees. Plaintiff was able to stand on one leg at a time without difficulty. Her lumbar region was not tender and she did not have lumbar paravertebral muscle spasm. Her straight leg raising was normal to ninety degrees bilaterally in the supine and sitting positions. Plaintiff's lateral flexion of her spine was normal to thirty degrees bilaterally. Plaintiff's hips were not tender and her hip flexion was normal to 120 degrees bilaterally. Plaintiff's hip extension was normal to thirty degrees bilaterally (R. 729).

Dr. Guberman observed mild tenderness, but no spasm in Plaintiff's upper thoracic spine. Plaintiff's flexion was limited to thirty degrees and her rotation was diminished to twenty degrees bilaterally. Dr. Guberman found Plaintiff had no muscle weakness and normal sensation. He opined her Achilles, patellar, biceps, triceps, and brachioradialis reflexes were normal; her Hoffmann's and Babinski responses were negative and normal bilaterally. Plaintiff was able to walk on her heels, toes, and squat. Plaintiff could heel-to-toe walk (R. 730).

Dr. Guberman's impression was for chronic post-traumatic strain of the right shoulder, which included a history of rotator cuff tear, "s/p resection of the right acromioclavicular joint including the distal clavicle," and persistent range of motion abnormalities, and acute and chronic cervicothoracic spine strain, post-traumatic. Dr. Guberman found Plaintiff had reached her maximum medical improvement relative to her July 24, 2000 injury (R. 730). He opined "no further specific treatment and/or diagnostic testing [were] likely to improve her impairment" and that "[h]er impairment [was] likely to continue to be progressive" (R. 730-31).

On September 30, 2003, Plaintiff presented to Arthur Calhoun, M.D., with complaints of pain in shoulders, neck, arms and upper back. Through a review of Plaintiff's medical records and an interview of Plaintiff, Dr. Calhoun recounted Plaintiff's medical history relative to her neck, arms,

26

and shoulders. Plaintiff stated the medication she took "help[ed]" her sleep and kept her "going." Plaintiff stated the medication was "quite beneficial to her." If she did not take it, her pain level was at ten; if she took pain medication, it was at "5-6 level." Plaintiff stated she was able to "sleep with the Klonopin." Plaintiff stated she washed dishes, sometimes cooked, and drove short distances (R. 700). Upon examination, Plaintiff's "right shoulder and right arm . . . is (sic) less tender and has good ROM also." Plaintiff's bilateral reflexes, sensation, and strength were equal. Her pulses were "pretty good" bilaterally. Dr. Calhoun diagnosed pain in right and left shoulders; pain in neck; right rotator cuff tear; and pain in upper back. He prescribed Neurontin, Zanaflex, Ultram, Darvocet, and Klonopin (R. 701).

On October 2, 3, 8, 10, 15, 16, 17, 20, 22, 24, 27, and 29, 2003, Plaintiff received physical therapy at Bridgeport Physical Therapy for her shoulders and cervical spine (R. 768-816).

On October 1, 2003, Plaintiff informed Dr. Henry her shoulder had felt better since it had been injected on August 20, 2003. Plaintiff reported she was able to participate in aquatic strengthening program and her "pain ha[d] continued to improve." Upon physical examination, Plaintiff's right shoulder range of motion was "near full, active." Her rotator cuff was five out of five. Dr. Henry recommended Plaintiff continue physical therapy (R. 1134).

On October 16, 2003, Plaintiff returned to Dr. Calhoun for follow-up treatment for pain in shoulders, neck, arms, and upper back. Plaintiff delivered "a summary of hers to say what her lawyers would need to hopefully update her diagnoses from Worker's Comp." Plaintiff informed Dr. Calhoun that her current conditions were: both shoulders hurt, right hurts more than left; neck hurts, which can lead to tension headaches; upper back hurts; and right elbow hurts, and it hurts more when "stormy weather is coming" or if she is "particularly active." Plaintiff stated she had been

27

diagnosed with carpal tunnel syndrome, "or at least the probability of that." Plaintiff stated she could not do her former work. Plaintiff informed Dr. Calhoun she had her real estate license, but she felt she could not "do the driving that [was] necessary for that work." Plaintiff stated there were "days when she literally [could not] get out of bed and she [felt] terrible. There are other days that [were] pretty good and she [thought] that inconsistency would keep her from doing almost any other work" (R. 697).

Dr. Calhoun's examination of Plaintiff revealed equal arm strength bilaterally and reflexes and sensation equal bilaterally. Dr. Calhoun found both of Plaintiff's shoulders were tender anteriorly and posteriorly; her neck was tender; she had tender points around the scapula; and she had tender points at her lower back. He diagnosed bilateral shoulder pain, upper back pain, neck pain, and history of right rotator cuff tear. He continued Plaintiff's medications and noted he would write an updated summary for Workers' Compensation (R. 697).

On October 23, 2003, Dr. Calhoun corresponded with the West Virginia Workers's Compensation division relative to Plaintiff's "problems for which she has had a Workers [sic] Comp claim" (R. 969). He reviewed Plaintiff's medical history. He wrote it was his medical opinion Plaintiff's "right shoulder had mildly limited range of motion with mild tenderness. Her right elbow had good range of motion with mild tenderness. Her neck range of motion was mildly limited with mild right-sided tenderness. She had multiple tenderpoints around both scapulae and in the lower back. Her hands had normal sensation. Tinel's sign and Phalen's sign were negative. These tests are often positive with carpal tunnel syndrome" (R. 970).

On October 28, 2003, Plaintiff returned to Dr. Calhoun for treatment of shoulder, neck and back pain. Plaintiff stated she and Dr. Lauderman "had a falling out because he didn't produce a

paper she needed" and that she was "subsequently . . . dismissed from his practice." Plaintiff informed Dr. Calhoun that she may be receiving epidural injection in the cervical or trigger point injections at the pain clinic. Plaintiff stated she was undergoing aquatic physical therapy, which relieved her symptoms "the most of anything she'[d] been doing." Dr. Calhoun found Plaintiff's shoulder ranges of motion to be fair. He noted tenderness anteriorly and posteriorly in her shoulders. Plaintiff's neck had decreased range of motion and some tender points. Dr. Calhoun also noted "various points of the upper back and lower back that [were] tender." Plaintiff's right elbow was positive for "some minor tenderness of the bilateral epicondyle areas." Dr. Calhoun diagnosed neck pain, right shoulder strain, elbow pain, left should pain, and back pain. He refilled her medications prescriptions. Dr. Calhoun noted he intended to seek the opinion of Plaintiff's physical therapist as to whether "a TENS unit would be a good idea at home." Plaintiff was instructed to return in six weeks (R. 696).

Plaintiff received physical therapy for her shoulders and cervical spine at Bridgeport Physical Therapy on November 3, 6, 7, 11, 13, 17, 20, and 21, 2003 (R. 736-67).

On November 12, 2003, Plaintiff reported to Dr. Henry she had been diagnosed with probable rotator cuff syndrome with partial thickness tear. She stated she had been treated with medication, physical therapy, and injections "without much improvement." Plaintiff stated she had numbness and tingling in her hand, pain radiating up and down her entire right upper extremity into her neck, and pain across her back and shoulders. Plaintiff informed Dr. Henry she was told she may have fibromyalgia, may have carpal tunnel syndrome, and had "problems with her neck." Dr. Henry found Plaintiff's right shoulder had full range of motion, mildly positive impingement signs, and no AC joint tenderness. Her rotator cuff strength was five out of five. Dr. Henry assessed right

shoulder rotator cuff syndrome and questionable partial thickness tear. Dr. Henry discussed arthroscopic examination of Plaintiff's rotator cuff. Plaintiff stated she would consider her options and inform him if she wanted to set up the surgery (R. 1133).

On November 17, 2003, Plaintiff returned to Dr. Calhoun for treatment of shoulder, neck, back, and elbow pain. Plaintiff reported she had obtained a home TENS unit and authorization for additional aquatic physical therapy. Plaintiff stated she was being treated by Dr. Henry, an orthopedist, who recommended aquatic physical therapy and a brace for her elbow. Plaintiff also stated she had been diagnosed with carpal tunnel syndrome and was going to be evaluated by Dr. Kennedy on December 18, 2003, for surgery. Plaintiff requested Dr. Calhoun evaluate her fibromyalgia. Plaintiff stated she would like to work as a real estate agent, but she could not "drive because of the medicine she's taking and because of her hands." Plaintiff stated she would like to return to work as she was bored. Plaintiff stated she did her housework, "but [had] to do it in stages, resting for pain or fatigue reasons." Plaintiff stated she walked "most days if the weather [was] decent." Plaintiff stated her pain worsened in cold weather. Plaintiff stated she had "talked to Worker's [sic] Comp about vocational rehabilitation early on, but they haven't said anything about it in a long time" (R. 694).

Plaintiff complained of tenderness in the right anterior shoulder, around the right scapula, "minorly . . . in the left shoulder," and at her elbow (mildly). Dr. Calhoun diagnosed elbow, right shoulder, neck, and left shoulder pain. He noted he would consider referral for fibromyalgia. He urged Plaintiff to continue treatment with Dr. Henry. He prescribed Zanaflex, Darvocet, Klonopin, Neurontin, and Elavil, for which he intended to seek approval from Workers' Compensation (R. 694).

On November 21, 2003, Paul Bachwitt completed an Independent Medical Examination of Plaintiff. Dr. Bachwitt reviewed Plaintiff's medical history (R. 934-38). Dr. Bachwitt noted Plaintiff, in describing her current symptoms, "complained subjectively of constant aching, throbbing and sometimes dull pain in both shoulders, thoracic area, elbow, and neck." Plaintiff informed Dr. Bachwitt she had a torn rotator cuff, loss of range of motion, headaches, muscle spasms, and sporadic lower back pain from exercise. Plaintiff also "complain[ed] of bursitis and tendinitis" (R. 938).

When questioned about her activities of daily living by Dr. Bachwitt, Plaintiff stated "she no longer ha[d] normal days." Plaintiff stated someone drove her to physical therapy. Plaintiff stated she "trie[d] to rest." Plaintiff was able to tend to her own personal hygiene. She cooked sometimes, but she had to rest while doing it. She washed dishes with rest breaks. Plaintiff completed light housework with breaks. Plaintiff took naps "after getting too tired from therapy." Plaintiff stated she was unable to vacuum, drive, or do hobbies (R. 938).

On November 21, 2003, Dr. Bachwitt took an x-ray of Plaintiff's cervical spine. It was unremarkable. The x-ray of Plaintiff's right shoulder showed resection of the distal clavicle but was, otherwise, unremarkable. The x-ray of Plaintiff's left shoulder was unremarkable (R. 939).

Upon physical examination of Plaintiff's cervical spine, Plaintiff was able to turn her head up to 65 degrees to the right and left. Plaintiff's lateral cervical flexion was as great as 38 degrees on the right and 37 degrees on the left. Plaintiff's forward flexion was as up to 52 degrees and her extension was up to 43 degrees. Plaintiff's grip strength was measured at eighty pounds on the right and 72 pounds on the left. Plaintiff could pinch up to 14 pounds on the right and 16 pounds on the left. Plaintiff's upper extremity muscles were tested for strength and were strong and equal

bilaterally. Plaintiff complained of mild tenderness to light palpation over the paraspinal and trapezius muscles on the right but not on the left. Dr. Bachwitt observed no paraspinal or trapezius spasm on either side (R. 939).

Plaintiff's right shoulder flexion was zero to 110 degrees, extension from zero to fifty degrees, abduction from zero to 130 degrees, and adduction from nine to thirty degrees. Plaintiff's shoulder was tested with her elbow held at ninety degrees and her internal rotation was equal to forty degrees and external rotation was equal to eighty degrees. Plaintiff's left shoulder flexion was zero to 160 degrees, extension was from zero to fifty degrees, abduction was from zero to 140 degrees, and adduction was from zero to fifty degrees. Plaintiff's left shoulder was tested with her elbow held at ninety degrees and her internal and external rotations were equal to ninety degrees (R. 940).

On December 4, 2003, Prasadarao B. Mukkamala, M.D., examined Plaintiff "on behalf of the employer." Plaintiff informed Dr. Mukkamala she had a history of diabetes and hypertension (R. 944). Plaintiff stated she was medicating with Klonopin, Amitriptyline, Darvocet, and Neurontin. Plaintiff informed Dr. Mukkamala she smoked one package of cigarettes per day. Plaintiff stated her current symptoms were pain in her neck, pain in her shoulders, pain in her upper back, and headaches (R. 945). Plaintiff informed Dr. Mukkamala she was "able to carry on her activities of daily living very well." Plaintiff stated she did some cooking and some cleaning, which "'depend[ed] upon if [she] [felt] like it.'" In response to Dr. Mukkamala asking Plaintiff if she felt she could return to work, Plaintiff stated she had recently been diagnosed with carpal tunnel syndrome and was "looking for treatment for that" and that an MRI had "revealed rotator cuff tear and she [was] looking for treatment for that." Dr. Mukkamala reviewed the following medical records of Plaintiff: United Hospital Center records; Dr. C. Lefebure's records; Dr. D. Sickles'

records; May 17, 2001, cervical spine x-ray; Dr. M. Darmelio's records; September 6, 2002, MRI of right shoulder; McCarter Chiropractic Clinic records; correspondence of Dr. Lauderman; physical therapy records of Bridgeport Physical Therapy; and Dr. Guberman's evaluation (R. 946-48).

Upon physical examination of Plaintiff, Dr. Mukkamala found Plaintiff's "true spine flexion" was 54 degrees. Plaintiff's true cervical spine extension was fifty degrees. Her right lateral flexion was 45 degrees and her left lateral flexion was 44 degrees. Plaintiff's neck rotation was eighty degrees to the left and to the right. Dr. Mukkamala found that while Plaintiff's "cervical spine extension was slightly limited, all the rest of the range of motion was within normal limits." Dr. Mukkamala found no paracervical muscle spasm or tenderness. Dr. Mukkamala found Plaintiff's upper extremity range of motion was normal except for the right shoulder. Flexion of the right shoulder was 160 degrees, extension was fifty degrees, abduction was 150 degrees, adduction was forty degrees, external rotation was seventy degrees, and internal rotation was eighty degrees. Motor examination was normal in both upper extremities. Sensory examination revealed diminution of sensation in the upper right extremity. Plaintiff's deep tendon reflexes were normal. Plaintiff's grip strength was measured at sixty pounds in each hand (R. 948).

Dr. Mukkamala found no crepitus or instability in Plaintiff's right shoulder (R. 948). He opined that "[b]asically, clinical examination of the right shoulder was completely normal." Additionally, Dr. Mukkamala found Plaintiff's lower extremities revealed normal deep tendon reflexes, normal motor and sensory examinations, Babinski was flexor on both sides, and no ankle clonus. Dr. Mukkamala observed Plaintiff could ambulate independently and walked with a normal gait. Plaintiff could to walk and heel walk "fairly well" (R. 949).

Dr. Mukkamala diagnosed nonspecific neck pain and status post subacrominal

decompression with resection of the distal clavicle for the right shoulder. He concluded Plaintiff had reached maximum degree of medical improvement. He found no evidence of radiculopathy (R. 949).

On December 18, 2003, Dr. Kennedy completed an "Extended Initial Consultation and AOE/COE for West Virginia State Worker's Compensation of Plaintiff. He reviewed no medical records in completing this report. The history of Plaintiff's injury and treatment therefor were in her "own words" and were recounted by Dr. Kennedy (R.1040-45). Plaintiff reported she had a cold intolerance, discomfort in both shoulders, discomfort in both elbows, neck pain, trigger points in upper back and shoulders, awakened with numbness and tingling, weakness of grip and pinch, difficulty writing, fatigue, pain in thumbs, aching sensation throughout hands when used for repetitive tasks, and difficulty holding phone, curling iron, or hair dryer. Plaintiff stated her driving limited to thirty minutes (R. 1045).

Upon examination, Plaintiff's neck flexion was fifty degrees bilaterally, extension was 45 degrees bilaterally, rotation was seventy degrees bilaterally, and tilt was 45 degrees bilaterally, all of which were normal (R. 1046). Plaintiff was positive for "muscle spasm/tenderness/trigger points" at paraspinous, parascapular, pararhomboid, trapezius, deltoid, upper arm, forearm, and intrinsics bilaterally (R. 1046-47). Plaintiff's shoulder abduction was 160 degrees right and 140 degrees left; flexion was 150 degrees right and 130 degrees left; and extension was forty degrees bilaterally, which was normal. Dr. Kennedy noted the impingement test was "essentially negative bilaterally." There was no sign of rotator cuff tenderness, but Plaintiff had "diffuse tenderness throughout the soft tissue surrounding both shoulders . . . ." Plaintiff's elbow flexion, extension, pronation, and supination tests were normal. Plaintiff's wrist test results were as follows: flexion was 65 degrees right and forty degrees left; extension was normal, ulnar deviation was normal; radiation deviation

34

was 15 degrees right and twenty degrees left (R. 1047). Plaintiff's finger range of motion tests were normal. Plaintiff's thumb examinations produced normal results (R. 1048-51).

Dr. Kennedy reviewed Plaintiff's June, 2001, MRI of her right shoulder, which he found showed a "partial tear of the supraspinatus plus impingement syndrome." He reviewed Plaintiff's May, 2002, MRI of her right shoulder, which showed post operative changes and a partial tear. He reviewed the February 28, 2003, EMG nerve conduction study which "indicat[ed] bilateral carpal tunnel syndrome." Dr. Kennedy also reviewed the March, 2003, MRI of Plaintiff's cervical spine, which was normal (R. 1051-52).

Dr. Kennedy's impressions were for: "bilateral carpal tunnel syndrome by clinical and positive nerve conduction study criteria, work-related"; bilateral ulnar nerve impingement at the wrists by clinical but negative nerve conduction study criteria, work-related"; "fibromyalgia by pressure point criteria and clinical history, work aggravated"; and history of right shoulder impingement syndrome, status post acromioclavicular. He opined Plaintiff "indeed represent[ed] a repetitive activity syndrome." He further opined Plaintiff manifested "trigger points throughout the paraspinous, Pararhomboid, and upper extremity musculature as well as the neck . . . ." He noted Plaintiff had aggravation of right shoulder impingement. Dr. Kennedy found Plaintiff had "the diagnosis of bilateral carpal tunnel which [was] often times related to fibromyalgia owing to swelling and impingement . . . ." Dr. Kennedy noted Plaintiff's "ongoing complaints included ulnar nerve impingement which often times accompanies carpal tunnel syndrome . . ." (R. 1052).

Dr. Kennedy opined Plaintiff was not "capable of returning to an assembly line or fabrication type of activity until further notice" (R. 1052). He also opined Plaintiff would "require some element of vocational rehabilitation subsequent to her treatment" for her conditions. Dr. Kennedy

35

recommended a rheumatology consultation to confirm and treat fibromyalgia, cortisone injections to trigger points, and no surgical treatment (R. 1053).

On December 30, 2003, Plaintiff presented to Dr. Henry with complaints of back and neck pain that radiated down the upper back region and down her arms and into her hands. Plaintiff informed Dr. Henry she had "carpal tunnel documented by EMG," but was "declining to do anything about it secondary to her history of fibromyalgia." Dr. Henry found Plaintiff's right shoulder had full range of motion, no AC joint tenderness, mildly positive impingement signs, and her rotator cuff strength was five out of five. He diagnosed rotator cuff syndrome with questionable partial thickness tear. Dr. Henry noted he thought Plaintiff's "multiple complaints . . . [were] either related to cervical spine, carpal tunnel or her fibromyalgia." He did not "believe . . . the majority of her symptoms . . . [were] coming from her shoulder." He ordered an arthrogram (R. 1132).

On January 13, 2004, Plaintiff presented to Dr. Calhoun with complaints of shoulder, neck, back, and elbow pain. Dr. Calhoun noted Plaintiff provided him documentation that she had been awarded temporary total disability through September 24, 2003, by the West Virginia Workers' Compensation Division. Plaintiff suggested to Dr. Calhoun that her temporary total disability status should continue through the date of the examination because she had not received cervical steroid injections. Dr. Calhoun also noted a second Workers' Compensation claim was being pursued by Plaintiff for carpal tunnel syndrome. Dr. Calhoun reviewed a report from Dr. Kennedy relative to that the carpal tunnel syndrome and his recommendation therein that Plaintiff undergo another EMG (R. 1109).

Dr. Calhoun's examination of Plaintiff revealed right elbow tenderness, right shoulder tenderness, multiple trigger points on the left and right parts of her back. He assessed elbow, right

36

shoulder, neck, and left shoulder pain. Dr. Calhoun and Plaintiff decided Dr. Kennedy would pursue her Workers' Compensation claim for carpal tunnel syndrome. He volunteered to make an appointment for Plaintiff to be examined by Dr. Hornsby for a fibromyalgia assessment. He prescribed Darvocet and Clonazapam (R. 1109).

On January 15, 2004, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. Plaintiff was found to be able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull unlimited (R. 794). Plaintiff was occasionally limited in her ability climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff was found to never be able to climb ladders, ropes, or scaffolds (R. 705). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 707-07). It was determined Plaintiff should avoid concentrated exposure to extreme cold and hazards, but had no limitations regarding her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, or poor ventilation (R. 707). The state-agency physician reduced Plaintiff's RFC to light (R. 708).

On January 21, 2004, an arthrogram was made of Plaintiff's right shoulder (R. 955). It was normal. The report read there was no complete tear of the rotator cuff tendon (R. 956).

Also on January 21, 2004, a CT scan was made of Plaintiff's right shoulder. It was normal (R. 956).

On January 28, 2004, Plaintiff received a cervical epidural steroid injection at the West Virginia Pain Treatment Center from Dr. Navalgund upon Dr. Vaglienti's orders for treatment of a cervical sprain/strain (R. 1082, 1123).

On February 3, 2004, Plaintiff was examined by Dr. Henry, who noted Plaintiff's arthrogram "confirmed that the rotator cuff [was] indeed intact." Plaintiff's right shoulder range of motion was full, her rotator cuff strength was five out of five, and she was mildly positive for impingement signs. Dr. Henry's impression was for right shoulder rotator cuff syndrome. His plan was to "hold off on any further treatment until" Plaintiff had both carpal tunnels and elbows injected (R. 1131).

On February 5, 2004, Dr. Kennedy injected Kenalog into Plaintiff's right and left carpal tunnel space and right and left ulnar nerve at Canal of de Guyon for treatment to bilateral flexor tendon tenosynovitis and bilateral medial and ulnar nerve compression at her wrist (R. 1122).

Also on February 5, 2004, Dr. Kennedy filed an "Interval Report" with West Virginia State Worker's Compensation Division. He noted Plaintiff had received a cortisone injection and cervical block (R. 1028). Dr. Kennedy also noted Plaintiff was pending approval for an EMG nerve conduction study and that her last study had "been essentially done a year ago by the chiropractor with the accuracy of the study in question despite the diagnosis given of bilateral carpal tunnel" (R. 1028-29). Dr. Kennedy's examination of Plaintiff revealed a weakly positive Tinel's sign and positive wrist flexion and Phalen's tests. Plaintiff had no atrophy, her sensation was intact, and her grip and pinch were "somewhat diminished." Dr. Kennedy found Plaintiff had diffuse tenderness throughout the lateral epicondylar and triceps tendon insertion at both elbows as well as at diffuse points and trigger sites at the parascapular and neck areas. Dr. Kennedy's impressions were for: "bilateral carpal tunnel syndrome by clinical and positive nerve conduction study criteria, work-related"; bilateral ulnar nerve impingement at the wrists by clinical but negative nerve conduction study criteria, work-related"; "fibromyalgia by pressure point criteria and clinical history, work aggravated"; and history of right shoulder impingement syndrome, status post acromioclavicular. Dr.

Kennedy opined Plaintiff was temporarily totally disabled until March 31, 2004. Dr. Kennedy recommended Plaintiff undergo a nerve conduction study, receive a cortisone injection, and be "left open as a candidate for trigger point injections to her fibromyositis sites in the neck and arms" (R. 1029).

On February 12, 2004, Plaintiff returned to Dr. Calhoun for follow-up for her shoulder, neck, back, and elbow pain. Plaintiff reported a cervical epidural steroid injection she had at the pain clinic two weeks earlier "definitely helped some." Dr. Calhoun's examination of Plaintiff revealed various tender points, especially around the edges of the scapula and tender points in the middle and lower back. Dr. Calhoun assessed elbow, neck and bilateral shoulder pain. He prescribed Darvocet, Klonopin, and Amitriptyline. Dr. Calhoun completed forms to reopen Plaintiff's claim for further total temporary disability benefits (R. 1107).

On February 20, 2004, Jack S. Koay, M.D., completed an Independent Medical Examination of Plaintiff for the West Virginia Bureau of Employment Programs. Dr. Koay reviewed Plaintiff's past history of an "injury that occurred on 04/15/2003 regarding to the injury on both hands" (R. 957). Plaintiff described her right hand pain as intermittent and rated her pain as "5/10 to 6/10" on a scale from zero to ten, with ten being the greatest pain. Plaintiff stated she experienced intermittent numbness on the Thenar area and tingling on the hypothenar area. Plaintiff had no stiffness. She complained of grip weakness. As to her left hand, Plaintiff stated her pain was "4/10 to 6/10" and was intermittent. Plaintiff stated she had numbness on the little and index fingers, questionable stiffness, grip weakness, and pain associated with cold weather and rainy days (R. 959). Plaintiff stated that "because of the pain and numbness on both hands she [was] unable to work" (R. 964). Plaintiff listed her medications as Darvocet, Zanaflex, Neurontin, Advil, Ibuprofen, and birth control

pills. Plaintiff informed Dr. Koay she smoked one package of cigarettes per day (R. 960).

Dr. Koay observed Plaintiff's gait was normal and that she did not use wrist splints on either hand. Plaintiff was alert, active, awake, friendly, and cooperative during the examination. Dr. Koay opined Plaintiff was not in "any acute distress condition at all." Dr. Koay observed that during the one-hour and forty-two minute interview and examination, Plaintiff was able to walk around the room and get on and off the examination table unassisted. Plaintiff's average blood pressure was 130/84. Plaintiff's average grip strength in her right hand was 59.5 pounds and was sixty pounds in her left hand (R. 961). Plaintiff's Tinel's signs and Allen's test were negative and her thenar and hypothenar muscles were intact bilaterally. Plaintiff finger ranges of motion were full bilaterally. Her thumb adduction was zero bilaterally; radial abduction was 82 on the right and 83 on the left. Plaintiff's sensory examination was normal and her motor strength was 5/5 bilaterally. Plaintiff's range of motion was as follows: right flexion was 62 degrees, right extension was sixty degrees, radial deviation was 24 degrees, and ulnar deviation was forty degrees; left flexion was 65 degrees, left extension was 61 degrees, left radial deviation was 26 degrees, and left ulnar deviation was forty degrees. Abduction and adduction of the middle, right, and little fingers was intact bilaterally (R. 962). No atrophy was observed (R. 963).

Dr. Koay reviewed the February 28, 2003, EMG taken by Dr. Kominsky, and noted that report "showed bilateral carpal tunnel syndrome" (R. 963). Dr. Koay's clinical impression was for pain, numbness and tingling on both hands. He opined neither hand had reached maximum medical improvement. He recommended Plaintiff should undergo an EMG and nerve conduction study on both hands. Dr. Koay opined Plaintiff was temporarily totally disabled (R. 964).

On March 9, 2004, a Electromyography study was completed on Plaintiff (R. 1010-14). It

was "essentially normal and [was] not supportive of carpal tunnel syndrome, ulnar neuropathy, brachial plexopathy, or C5-T1 radiculopathy on either side" (R. 1012, 1014).

On March 11, 2004, Plaintiff returned to Dr. Calhoun. He continued to "work[] on filling out a reopening form for her Worker's Comp claim that involved her elbow and shoulder and neck." Dr. Calhoun noted he was awaiting input from her lawyer "as to what need[ed] to be on [the form] and then [he] need[ed] to decide[] whether it can be put on there or not." Plaintiff reported Dr. Kennedy stated her EMG was normal and she could not believe that. She also reported that Dr. Kennedy stated the EMG could have been affected by the steroid injection she had received and that if she continued to improve, he was going to "say she can go back to work." Plaintiff asserted she could not because she had "other problems other than the carpal tunnel syndrome." Upon examination, Dr. Calhoun noted Plaintiff's right elbow range of motion was normal, her right shoulder had good range of motion, but tenderness. Dr. Calhoun prescribed Midrin for headaches, Klonopin, and Darvocet (R. 1104).

On March 11, 2004, Dr. Kennedy submitted an "Interval Report" to West Virginia State Worker's Compensation Division. Dr. Kennedy wrote the cortisone injection Plaintiff received one month earlier had improved the numbness, tingling, pain, and nocturnal complaints relative to her medial and ulnar nerves at the wrists. Dr. Kennedy also noted Plaintiff had received a cervical epidural steroid injection one month earlier and had realized "marked improvement in her fibromyalgia-type and impingement complaints at the neck," but she still had occasional trigger points throughout her neck and upper torso area (R. 1025). Dr. Kennedy noted Plaintiff's March 9, 2004, nerve conduction study was normal (R. 1026). His impressions were as follows: "bilateral carpal tunnel syndrome by clinical and positive nerve conduction study criteria, work-related";

bilateral ulnar nerve impingement at the wrists by clinical but negative nerve conduction study criteria, work-related"; "fibromyalgia by pressure point criteria and clinical history, work aggravated"; and history of right shoulder impingement syndrome, status post acromioclavicular. He opined Plaintiff was temporarily totally disabled until April 30, 2004. Dr. Kennedy found Plaintiff "show[ed] definitive improvement with conservative management as noted inclusive of the cortisone injections" and recommended Plaintiff continue on the same course of treatment. He deferred any decision about Plaintiff undergoing surgery based on her "marked improvement in her clinical state following the cortisone injections and the more recent nerve conduction now converting from abnormal as previously noted to normal." Dr. Kennedy deferred trigger point injections for fibromyalgia until Plaintiff was evaluated by a rheumatologist (R. 1026).

On March 19, 2004, Plaintiff presented to Dr. Vaglienti at the West Virginia Pain Treatment Center as a follow up to her cervical epidural steroid injection. She reported an eighty percent improvement after the previous injection. Dr. Vaglienti repeated the cervical epidural steroid injection (R. 1078, 1121).

On March 23, 2004, Plaintiff was treated by Dr. Henry for right upper extremity pain. Plaintiff informed him that the cervical injection and carpal tunnel injections "help[ed] quite a bit with the right upper extremity pain she was having." Plaintiff stated she had "quite a bit of pain in" her upper back. Dr. Henry found Plaintiff had full, painless range of motion in her right shoulder, mildly positive impingement signs, and five out of five rotator cuff strength. Dr. Henry noted "some mild tenderness" in a small area anterior deltoid region, but no palpable masses were noted. Dr. Henry assessed right shoulder rotator cuff syndrome with probable partial thickness tear. Dr. Henry noted Plaintiff had "had arthrogram which was negative for rotator cuff tear followed by CT scan

42

of shoulder with contrast dye which was negative. MRI showing small, partial thickness tear. She has noted significant improvement following injection of the cervical spine, injection both carpal tunnels which would lead me to believe that most likely the majority of her symptoms are coming from her cervical spine or from carpal tunnel syndrome. I am not optimistic at this point in time, [sic] that the shoulder is causing a significant amount of pain for her. I recommend she continue follow up having cervical spine and carpal tunnels treated. In terms of shoulder, I recommend she follow up with myself on an as needed basis" (R. 1130).

On April 8, 2004, Plaintiff presented to Dr. Calhoun for elbow, shoulder, and neck pain. She stated she could not "picture herself doing any work mainly because there [were] just some days she . . . couldn't get through the day. She would be unreliable." Plaintiff reported the steroid injection she received in her neck reduced her symptoms for two weeks. Plaintiff "mention[ed] that she would like counseling. She [felt] the chronic pain connected with social pressures [were] just contributing to her feeling like she's going to cry, like she's out of control . . . ." Plaintiff stated she felt there was stress on her marriage, she could drive not her all-terrain vehicle, and she prayed and related to God, but did not attend church. Upon examination, Dr. Calhoun observed tenderness at the right scapula and "pretty normal" range of motion in both shoulders. He assessed bilateral shoulder pain, elbow and neck pain. Dr. Calhoun prescribed Neurontin, Darvocet, and Klonopin. He applied for approval for counseling and recommended Plaintiff return in six weeks (R. 1103).

On April 15, 2004, Dr. Kennedy submitted an "Interval Report" to West Virginia State Worker's Compensation Division. Dr. Kennedy noted Plaintiff had realized some relief to the symptoms in her medial and ulnar nerves because of a cortisone injection two months earlier, but that her symptoms had returned "full blown." Plaintiff also complained of hand swelling, cold

intolerance, and a "cold feel to her hands." Plaintiff stated her muscles ached in her shoulder and upper neck (R. 1022). Dr. Kennedy reviewed the February 20, 2004, report of Dr. Koay, and the March 9, 2004, nerve conduction study, which was normal (R. 1023).

Dr. Kennedy's examination of Plaintiff revealed improvement in the swelling of her wrist. He noted hand swelling, especially in her fingers. Plaintiff's compression test, Tinel's sign, and wrist flexion were positive for medial and ulnar nerve irritability, bilaterally. Plaintiff's grip and pinch strengths were intact. Dr. Kennedy's impressions were as follows: "bilateral carpal tunnel syndrome by clinical and positive nerve conduction study criteria, work-related"; "bilateral ulnar nerve impingement at the wrists by clinical but negative nerve conduction study criteria, work-related": "fibromyalgia by pressure point criteria and clinical history, work aggravated"; and history or right shoulder impingement syndrome, status post acromioclavicular resection. Dr. Kennedy opined Plaintiff was temporarily totally disabled until June 15, 2004 (R. 1023).

Dr. Kennedy recommended Plaintiff be examined by a rheumatologist. Dr. Kennedy deferred any surgical considerations for Plaintiff until further evaluations. He recommended Plaintiff continue with muscle relaxants and anti-inflammatory drugs to treat her symptoms (R. 1023).

On May 3, 2004, Plaintiff received a cervical epidural steroid injection from Dr. Vaglienti at West Virginia Pain Treatment Center (R. 1073, 1120).

On May 11, 2004, Plaintiff reported to Dr. Calhoun that the cervical epidural steroid injection she had on April 15 "helped her left shoulder, it helped her neck and it helped her right shoulder." Plaintiff reported she could not work because of the pain in her neck, right shoulder, and right elbow. Plaintiff stated pain medication did help her symptoms. Dr. Calhoun observed tenderness in Plaintiff's shoulders and "pretty good" range of motion. He prescribed Darvocet, Zanaflex,

Nurontin, and Klonopin. He continued to "work on appointment with Dr. McClure, the psychiatrist" and he completed the form for approval of aquatic therapy by West Virginia Workers' Compensation Division (R. 1101).

On May 19, 2004, an Evaluation Form – New Patient was completed on Plaintiff at Psychiatric Associates (R. 1137). She was diagnosed with major depression due to pain and inability to work. Her Global Assessment of Functioning ("GAF") was assessed as 75 [2] (R. 1138).

On May 28, 2004, Plaintiff was administered a cervical epidural steroid injection by Dr. Vaglienti (R. 1069, 1119).

On June 10, 2004, Plaintiff informed Dr. Calhoun she was treated by Dr. McClure, a psychiatrist, in May. Plaintiff reported she used a home TENS unit with "varying frequency." Plaintiff stated she had received "another shot in the neck area" at the pain clinic, and it "helped some and lasted longer than the last one." Plaintiff reported her pain level had increased recently, but she attributed that to her having increased her level of activity. Dr. Calhoun prescribed Darvocet and Klonopin (R. 1100, 1161).

On June 17, 2004, Jo Ann Allen Hornsby, M.D., completed a consultative evaluation of Plaintiff for fibromyalgia at Dr. Kennedy's request. Plaintiff informed Dr. Hornsby she had neck pain that went into her shoulders and into her back. Plaintiff stated "her arms to her hands also bother[ed] her." Plaintiff stated she did not have leg pain and that she slept "fairly well." Plaintiff informed Dr. Hornsby that she had "[felt] depressed and [had] seen a psychiatrist," who prescribed

---

[2]A GAF of 71 to 80 indicates: **If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in schoolwork). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

medications, but those medications had not been approved by Workers' Compensation. Plaintiff also stated she had a history of migraine headaches (R. 979).

Upon physical examination, Dr. Hornsby noted Plaintiff was not in acute distress. Dr. Hornsby opined Plaintiff had "about 8/18 fibromyalgia tender points and most of those were located across the neck and upper back." Dr. Hornsby found Plaintiff had no synovitis in her hands, wrists, elbows, knees, ankles, or feet. Plaintiff's grip strength was 5/5 in her hands and she had no atrophy. Dr. Hornsby noted "some crepitus in the right shoulder with range of motion" (R. 979).

Dr. Hornsby reviewed the MRI of Plaintiff's cervical spine and noted it was "negative according to notes from Dr. Kennedy." Dr. Hornsby also noted Plaintiff's February 2003, EMG showed "some bilateral carpal tunnel" and the March 9, 2004, EMG was an "essentially normal study" (R. 979).

Dr. Hornsby found Plaintiff did "not fit the American College of Rheumatology classification criteria for a diagnosis of fibromyalgia." To support this finding, Dr. Hornsby noted Plaintiff did not have pain "all over" and did not have "11/18 fibromyalgia tender points." Dr. Hornsby opined Plaintiff "appear[ed] to have more of a regional myofacial-type pain syndrome" and "mild carpal tunnel by one EMG and negative by another." Dr. Hornsby recommended further testing for carpal tunnel and "aggressive treatment for her depression, which could certainly mimic fibromyalgia symptoms and worsen her chronic pain . . . ." Dr. Hornsby told Plaintiff that it was her opinion that fibromyalgia was not a crippling or deforming impairment and there was no "clear evidence" that it was "precipitated by injury" (R. 979).

On June 24, 2004, Dr. Kennedy filed a "Permanent Stationary Report" with West Virginia Worker's Compensation Division. He reviewed the June 17, 2004, reported issued by Dr. Hornsby

(R. 1017). Dr. Kennedy noted the following assertions by Plaintiff: she was "having intermittent but less in the way of carpal tunnel-like complaints with numbness and tingling in her hands but [was] still incapable of driving owing to the stiffness in her upper extremities"; she had days when she was "so stiff that she [could not] get out of bed"; she continued use of amitriptyline for sleep at night; and she confirmed the "involvement of lower extremities at the time of her evaluation by Dr. Hornsby were [sic] nil" (R. 1017-18).

Dr. Kennedy's physical examination "show[ed] indeed marked improvement in the swelling of the volar wrist compartments." Plaintiff had negative Tinel's sign, positive compression test, and negative flexion test for the medial and ulnar nerves in both wrists. Plaintiff's grip and pinch strengths were intact. Plaintiff had point tenderness at the right lateral and medial epicondylar areas, but she did not have "classic tennis elbow complaints worthy of treatment." Plaintiff had "some diffuse tenderness at the cervical neck and a pararhomboid area but again not specific knots or trigger points as noted before" (R. 1018).

Dr. Kennedy's impressions were for "bilateral carpal tunnel syndrome by clinical and positive nerve conduction study criteria, work related"; "bilateral ulnar nerve impingement at the wrists by clinical but negative nerve conduction study criteria, work related"; "fibromyalgia by pressure point criteria and clinical history, work aggravated"; and history of right shoulder impingement syndrome, status post acromioclavicular resection. He noted Plaintiff "presented with an ongoing problem of a probable fibromyalgia versus a myofascial pain syndrome. [Plaintiff] has repetitive problems of stiffness, irritability and swelling with involvement of severe pain in the neck, shoulder girdles, elbows, wrist and forearms as well as the lower extremities. [Plaintiff] has seasonal as well as barometric pressure penetration of these symptoms with colder weather and drop in

barometric pressure exacerbating same." Dr. Kennedy further noted Plaintiff "has at this juncture been termed in need of conservative care of what appears to be a carpal tunnel syndrome first confirmed clinically and will [sic] positive nerve conductions but now showing minimal penetration both clinically and with normal nerve conductions" (R. 1918). He found Plaintiff's right shoulder impingement was "not as specific as noted before." He found Plaintiff did not exaggerate and opined Plaintiff's disability status was "permanent and stationary." Dr. Kennedy's subjective findings were that Plaintiff had "minimal to moderate discomfort" involving her upper extremities and that her discomfort became "moderate to severe" if she did "any repetitive activity or forceful pushing, pulling and lifting." His objective findings were as follows: Plaintiff had diffuse tenderness on the right lateral and medial epicondylar area; she had "previous positive nerve conductions now converted to normal for bilateral upper extremities"; and Plaintiff had no wrist swelling, but had positive compression test for her median nerve (R. 1019).     Dr. Kennedy opined Plaintiff would be "capable of more sedentary type" of work activity. He opined that Plaintiff was not a candidate for carpal tunnel release because of the negative nerve conduction study and the "subtle findings of carpal tunnel on physical exam." He recommended Plaintiff's myofascial pain syndrome be treated by her primary care physician and at the pain clinic. He concurred with Dr. Hornsby that Plaintiff did not have "all the trigger points manifesting fibromyalgia at this time and [was] more representative of myofascial pain syndrome," but noted Plaintiff had, "in the past and particularly on a seasonal basis manifested such trigger points and therefore maybe [sic] evaluated in the future by a rheumatology consult in the event that her disease become more prominent." He recommended Plaintiff continue amitriptyline for sleep and cortisone injections for epicondylitis or tendinitis. He also recommended she be treated with muscle relaxants and over-the-counter non-steroidal anti-inflammatory medications on an "as needed basis" by a rheumatologist (R. 1020).

On June 30, 2004, Plaintiff received a cervical epidural steroid injection at the West Virginia Pain Clinic for chronic pain (R. 1058, 1118). She was instructed to return "another day for injection (R. 1118).

On July 2, 2004, Plaintiff presented to Dr. Calhoun with back and neck pain. Plaintiff reported she had been examined by Dr. Hornsby and reported to Dr. Calhoun that she "wasn't very impressed by [Dr. Hornsby] because the doctor, right off the bat, told her that she didn't believe that fibromyalgia came out of a workplace injury." Plaintiff stated she had had four cervical epidural steroid injections, which "were helpful and their effect seemed to last longer with each injection." Dr. Calhoun noted Plaintiff's pain was "overall . . . somewhat better," but "somewhat worse" during the past few days." Plaintiff reported she had been active. Plaintiff complained of tenderness at her right shoulder, right neck and right upper back. Plaintiff's right shoulder range of motion was "pretty good." Plaintiff had less pain in her right elbow. Plaintiff's arm reflexes were equal, as was her strength (R. 1098, 1160).

On July 13, 2004, Plaintiff was examined by Dr. Calhoun for shoulder, elbow, and neck pain. Dr. Calhoun noted Dr. Hornsby "had suggested" Plaintiff "needed" an antidepressant and Dr. McClure "felt she had a major depression." Dr. Calhoun noted Dr. McClure wanted to "see [Plaintiff] in follow-up." Upon examination, Dr. Calhoun noted Plaintiff had arm tenderness, bilaterally. He prescribed Lexapro and wrote a letter for a psychiatric follow-up (R. 1159).

On July 20, 2004, Plaintiff presented to Dr. Henry regarding her shoulder. She had "pretty much full, painless range of motion of the shoulder." Dr. Henry noted she had "mildly positive impingement signs." His impression was for right shoulder rotator cuff syndrome and he provided Plaintiff an injection of Depro Medrol and Lidocaine for treatment (R. 1129, 1150).

On August 11, 2004, Plaintiff received a cervical epidural steroid injection at the UHA Pain Management Center (R. 1110).

On August 19, 2004, Dr. Kennedy was deposed relative to a Workers' Compensation Fund proceeding involving Plaintiff's claim. Dr. Kennedy testified that as of June 24, 2004, he had released Plaintiff from his care. Dr. Kennedy testified that Plaintiff would be a candidate for carpal tunnel surgery if the following "three things" occurred: (1) her physical findings for nerve impingement were greater then they were in June 24, 2004, which were for "very subtle physical findings of carpal tunnel"; (2) if the normal nerve conduction study would convert to "positive"; and (3) "if her fibromyalgia/myofascial pain syndrome were essentially brought under control and not manifest at any level of severity" (R. 1170). Dr. Kennedy testified at the deposition that the only release to work he could provide Plaintiff was restrictive light duty (R. 1171). Dr. Kennedy testified it was his opinion Plaintiff had myofascial pain syndrome, carpal tunnel syndrome, and ulnar nerve impingement at the wrists (R. 1173).

On August 26, 2004, Plaintiff presented to Dr. Calhoun with complaints of headaches and "not sleeping well." Dr. Calhoun assessed neck pain, headache, and insomnia. He prescribed Valium, Lexapro, Klonopin, Zanaflex, Darvocet, Neurontin, and Elavil (R. 1157).

On September 1, 2004, Dr. Calhoun wrote a letter, addressed to "Dear Sir or Madam," wherein he opined Plaintiff could not return to her previous job and "it would be difficult for her to work at almost any full time job because of her need to change positions and lie down." Dr. Calhoun suggested "a job could be tailored to her condition for her to work at home. This would be wonderful, if possible" (R. 1149).

On September 9, 2004, Plaintiff presented to Dr. Calhoun for neck, elbow, and shoulder pain.

50

Dr. Calhoun noted Plaintiff "[a]lso . . . had problems with depression." Dr. Calhoun and Plaintiff "spen[t] a lot of time" completing Workers' Compensation forms for medications and aquatic physical therapy. Dr. Calhoun had earlier provided Plaintiff samples of Lexapro, which caused Plaintiff's "mood [to be] a lot better" and caused her to feel better. Plaintiff reported she was sleeping better with Klonopin. Plaintiff complained of tenderness in her neck, which was caused by range of motion. Plaintiff stated her right elbow was "not very sore" and her right shoulder as tender. Dr. Calhoun assessed shoulder pain bilaterally, elbow pain, and neck pain (R. 1154).

Plaintiff had a cervical epidural on September 27, 2004, at the Center for Pain Management. She reported she "had four weeks of total pain relief from her last cervical epidural" (R. 1139).

On September 30, 2004, Dr. Kennedy wrote a letter to Regina Carpenter, Plaintiff's Social Security lawyer, relative to the disability questionnaire he was asked to complete. Dr. Kennedy wrote the nature and severity of Plaintiff's symptoms were credible and consistent with her diagnoses and objective findings. Dr. Kennedy wrote that the February, 2003, nerve conduction study showed Plaintiff had carpal tunnel syndrome, but the March 9, 2004, nerve conduction study was normal and no longer indicated bilateral carpal tunnel (R. 1163). Dr. Kennedy wrote Plaintiff's trigger points were not present at the time of her examination by the rheumatologist because Plaintiff was having "one of her better days having had preceding cortisone injections performed by me on February 5." Dr. Kennedy opined Plaintiff "would best be evaluated [for fibromyalgia] at a time. . . when she was having a flare-up of her disease" (R. 1163-64). Dr. Kennedy opined Plaintiff was "not capable of returning to her usual and customary work and with the irritability noted in both of her hands and may not be able to return to any form of livelihood that would require even the most remote utilization of her hands in a repetitive fashion. As most occupations require same, this does

present a considerable problem of livelihood to the patient" (R. 1164).

Plaintiff testified at the October 25, 2004, administrative hearing that she smoked one and one-half packs of cigarettes per day (R. 1184). She stated her shoulder pain was constant and aggravated by driving, weather, and repetitive activities (R. 1199). Her left shoulder was "better than [her] right." She testified she had trigger points around her scapula and mid back and the pain was constant (R. 1201). Her hands were cold, tingled, numb, swollen, and in pain, and her right hand was worse than the left (R. 1202). Plaintiff testified she did not drive long distances because it aggravated her shoulders, arms, and hands, causing spasms into her upper body (R. 1184). She testified she had headaches two or three times per week, which she treated with ice on her head and neck and for which she had to lie down. She described the pain as burning, stabbing and aching. (R. 1203-04). Plaintiff testified she had been diagnosed with major depression by Dr. McClure, but had not returned for follow-up treatment because Workers' Compensation had not authorized payment for that treatment (R. 1209). Her symptoms include getting "upset," crying, and worrying (R. 1209). Dr. Calhoun treated her with Lexapro. Plaintiff testified that the cervical epidural steroid injections provided relief to her symptoms for "about two, two and a half weeks" (R. 1219).

Plaintiff testified that she was able to "write some and then [her] neck [would] start hurting real bad and [her] hands [would] start going cold and [she could not] write too much." She could write checks (R. 1203). If she was not having a headache, she was able to be up all day, but would "sometimes . . . lay down . . . and take a nap" (R. 1204-05). She would lie down for "usually over an hour if [she had] a headache" (R. 1219). Plaintiff testified she had difficulty buttoning and zipping and that Dr. Kennedy had conducted several tests which caused her hands to shake because she was working with "all those small modalities." She said she sometimes dropped cups, glasses

52

and cigarettes (R. 1205). She could lift a Pepsi bottle and a jug of milk with her right hand (R. 1220). She said that talking on the phone was difficult because it involved sitting and holding the phone (R. 1205-06). She could talk on the phone for only 15 minutes at a time. Plaintiff testified she could do household chores, such as dishes, cooking, folding clothes, and taking clothes out of the washer, if she rested during the completion of the chore (R. 1206-07). She accompanied her husband to the grocery store and he pushed the cart and loaded the groceries into it (R. 1207). She read the Bible before retiring at night and attended church once or twice per month (R. 1217-18).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Slahta made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through June 30, 2004.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's bilateral carpal tunnel syndrome, bilateral ulnar nerve impingement, history of right shoulder impingement syndrome, status post acromioclavicular resection, myofascial pain syndrome, headaches, and depressive disorder are considered 'severe" based on the requirements in the Regulations. 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: she is able to perform the demands of sedentary work with certain modifications. She can perform all postural movements on an occasional basis. She can perform no repetitive overhead reaching and is limited to jobs requiring primarily gross grasping as opposed to

repetitive fine manipulation. She cannot be exposed to temperature extremes. She is limited to unskilled, low stress, entry-level work that involves one- to two-step work processes and routine, repetitive tasks, primarily working with things rather than people.

7. The claimant is unable to perform any of her past relevant work (20CFR § 404.1565).

8. The claimant is a "younger individual" (20 CFR § 404.1563).

9. The claimant has a "high school education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12. Although the claimant's limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as surveillance system monitor.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)) (R. 27-28).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept

to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff's contentions are as follows:

1.  Plaintiff "believe[s] [her] case was overlooked" (Plaintiff's brief at p. 9);

2.  Plaintiff "feel[s] that [her] disabilities are equal or greater to the impairments in Appendix 1 Subpart B" (Plaintiff's brief at p. 9);

3.  Plaintiff "believe[s] that [she] should be recieving [sic] benefits due to all the impairments [she] [had], including MAJOR DEPRESSION, but not limited to that. Physical impairments should have been listed, included, recognized" (Plaintiff's brief at p. 9);

4.  She "did not make allegations of [her] medical impairments" (Plaintiff's brief at p. 9); and

5.  The ALJ erred in not awarding benefits to her based on the VE stating there would be no jobs available to a hypothetical person, diagnosed with depression, "one third - two thirds of the time would these jobs be affected?" (Plaintiff's brief at p. 10).

The Commissioner contends:

1.  Plaintiff does not meet or equal listing 1.02.

2. The ALJ properly evaluated Plaintiff's subjective testimony in accordance with controlling regulations.

4. The ALJ properly determined that Plaintiff could perform some sedentary work.

## C. Plaintiff's Belief that Her Case was "Overlooked."

Plaintiff is proceeding with her Complaint *pro se*. She was, however, represented by counsel throughout the administrative level. In her Application Plaintiff alleged disability as a result of RSI tendonitis, bursitis, carpal tunnel syndrome, nerve impingement of neck, residuals from arthroplastic surgery, arthritis, inflammation, and asthma. In her reconsideration disability report, she reported having been diagnosed with fibromyalgia. At the hearing she reported problems with her shoulders and hands. She also reported suffering from headaches and depression. A review of both the administrative hearing and the ALJ's decision in this case substantially supports a finding that Plaintiff's case was not "overlooked." The ALJ found Plaintiff had severe impairments related to her complaints in the form of bilateral carpal tunnel syndrome, bilateral ulnar nerve impingement, history of right shoulder impingement syndrome, status post acromioclavicular resection, myofascial pain syndrome, headaches, and depressive disorder (R. 17). He noted Plaintiff alleged a diagnosis of fibromyalgia, but also noted that rheumatologist Hornsby concluded that she did not fit into the classification for a diagnosis of fibromyalgia and opined Plaintiff had more of a regional myofascial-type pain syndrome. He therefore rejected the diagnosis of fibromyalgia, but accepted the alternative diagnosis of myofacial pain syndrome and also found that to be a severe impairment.

The ALJ then followed all the remaining steps required in the sequential evaluation, beginning with comparing Plaintiff's impairments to the Listings in Appendix 1 to Subpart P of Regulations No. 4; evaluating her alleged mental impairments pursuant to the Regulations;

determining her RFC; and evaluating her credibility.

The ALJ then determined Plaintiff's Residual Functional Capacity ("RFC"), considering her own statements regarding her symptoms, medical opinions, treatment history, daily activities, and laboratory results and findings . The undersigned finds the ALJ's consideration in this regard is very thorough. Based on Plaintiff's RFC, the ALJ then determined that Plaintiff could not work at her past relevant work, but that she could perform limited sedentary work, which would include postural movements only on an occasional basis; no repetitive overhead reaching; jobs requiring primarily gross grasping as opposed to repetitive fine manipulation; no temperature extremes; in unskilled, low stress, entry-level work involving only one-to-two step work processes and routine, repetitive tasks, primarily working with things rather than people.

Upon review of all of the above, the undersigned finds Plaintiff's case was clearly not "overlooked."

### D.  Listed Impairments

Plaintiff next argues her disabilities are equal to or greater than the impairments listed in Appendix 1 Subpart B.  Plaintiff attached to her motion a copy of Appendix 1, Subpart B, Listing 1.02, which provides:

> 1.02 *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder,

elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Plaintiff argues that she has instability and chronic pain with signs of limitation of motion in her shoulder, elbow, and right wrist/hand. She specifically attaches portions of the record relating to her right shoulder impairment. In order to meet a Listing, a claimant must meet all parts of the Listing. In order for Plaintiff to meet or equal Listing 1.02, she must show her upper extremity impairment involves "one major peripheral joint in each upper extremity . . .resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." (Emphasis added). 1.00B2c in turn provides:

> What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to , the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

(Emphasis added).

The evidence does not support a finding that Plaintiff's shoulder impairment causes "an extreme loss of function of both upper extremities." Even with her carpal tunnel syndrome, Plaintiff informed Dr. Mukkamala she was "able to carry on her activities of daily living very well." Plaintiff stated she did some cooking and some cleaning, which "'depend[ed] upon if [she] [felt] like it.'" At the administrative hearing, Plaintiff testified she could do household chores, such as dishes, cooking, folding clothes, and taking clothes out of the washer, if she rested during the completion of the chore. Plaintiff therefore has not shown her arm impairments cause an extreme loss of

58

function in both upper extremities such as is contemplated by the Listing.

The undersigned therefore substantial evidence supports the ALJ's determination that Plaintiff does not meet or equal the Listings.

### E.  Mental and Physical Impairments

Plaintiff next argues that she should be receiving benefits due to all her impairments including, but not limited to major depression, and that her physical impairments "should have been listed, included, and recognized." As already noted, the undersigned finds the ALJ did a thorough job of listing and evaluating Plaintiff's physical impairments. He found her bilateral carpal tunnel syndrome, bilateral ulnar nerve impingement, history of right shoulder impingement syndrome, status post AC resection, myofacial pain syndrome, headaches, and depressive disorder were severe impairments. A review of the ALJ's decision shows he then considered these impairments singly and in combination, determining they did not meet or equal any of the Listings.

The ALJ next explicitly discussed Plaintiff's depression. He evaluated her depressive disorder under Section 12.04 of Appendix 1. He found the overall record supported a diagnosis of depression. He noted, however, that the psychiatrist, to whom she was referred by her treating physician, assessed Plaintiff's GAF as 75, denoting only a slight impairment, and that, although she was prescribed Lexapro by her treating physician, she never sought any further psychiatric treatment. The ALJ continued to evaluate Plaintiff's depression pursuant to the "B" criteria of the Listing, finding her activities of daily living were only mildly restricted with those restrictions being due mainly to physical, not mental impairments. He also found her social functioning was moderately limited and her concentration, persistence or pace was also moderately limited. The ALJ found Plaintiff had failed to document any episodes of decompensation.

The ALJ's findings regarding the limitations caused by Plaintiff's depression, alone and in combination with her other physical impairments, are substantially supported by the record. The psychiatrist to whom she was referred by her own treating physician assessed her with only a slight impairment. She never sought any other psychiatric or psychological treatment. Finally, despite finding Plaintiff's depression caused only mild to moderate limitations, the ALJ gave her the benefit of the doubt and limited her very significantly, to only unskilled, low stress, entry-level work that involved one-to-two step work processes and routine, repetitive tasks, primarily working with things rather than people.

Upon consideration of all which, the undersigned finds substantial evidence supports the ALJ's finding that Plaintiff's depression, singly or in combination with her other medically determinable impairments, was not disabling.

### F. "Allegations"

Plaintiff next argues: "I am complaining that I did not make allegations of my medical impairments." (Plaintiff's brief at 9). The undersigned is unsure exactly what Plaintiff's complaint in this regard means, but believes she thinks the use of the word "allegations" calls into question her truthfulness or credibility. For example, Plaintiff included in her attachments the following separate statement:

> I am very upset that I have read statements from Joanne B. Barnhart [former Commissioner of Social Security] that I the plaintiff has [sic] been making allegations regaurding [sic] my medical conditions. I have proof in black and white, the disabilities regaurding [sic] my claim are true and accurate. I am presenting these statements and facts in black & white.

(Plaintiff's brief at 12). The use of the words "allege" or "allegations" does not, however, in itself, cast doubt regarding Plaintiff's veracity. Instead, those words are routinely used in disability cases,

including the undersigned's own Reports and Recommendations. Here, as stated in the beginning of this R&R, Plaintiff "alleg[ed] disability since July 8, 2002 due to tendonitis, bursitis, carpal tunnel, nerve impingement of neck, post status right acromioclavicular (AC) joint clavicle arthroplasty, arthritis, inflamation, and asthma." These alleged impairments are taken directly from her own application. The ALJ in turn found that Plaintiff's bilateral carpal tunnel syndrome, bilateral ulnar nerve impingement, history of right shoulder impingement syndrome, status post acromioclavicular resection, myofascial pain syndrome, headaches, and depressive disorder were "severe," indicating he did not consider these impairments mere allegations, but actual medically-determinable impairments that significantly limited Plaintiff's physical or mental ability to do basic work activities. (R. 15, citing 20 CFR § 404.1520). The only diagnosis the ALJ expressly rejected was that of fibromyalgia, noting that Plaintiff's rheumatologist had found she did not fit into the classification for a diagnosis of fibromyalgia. Even then, however, he found Plaintiff's alternative diagnosis, regional myofascial-type pain syndrome, was a severe impairment.

Having found that Plaintiff had severe physical and mental impairments, the ALJ was next required to determine Plaintiff's Residual Functional Capacity ("RFC") – that is, the most she could still do after considering the effects of her physical and/or mental limitations that affect the ability to perform work-related tasks. 20 CFR § 404.1545 and Social Security Ruling ("SSR") 96-8p. In making the RFC assessment, the ALJ considers all the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. Social Security Ruling ("SSR") 96-7p provides:

> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence

of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

A review of the ALJ's decision in this case shows he considered "the entire case record," as required.. He thoroughly discussed the objective medical evidence, Plaintiff's own statements and testimony regarding her symptoms, opinions of Plaintiff's physicians, Plaintiff's treatment, and her own reported daily activities (R. 17-24). He found Plaintiff's testimony regarding the degree of her limitations not fully credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

Considering all of which, the undersigned finds substantial evidence supports the ALJ's credibility determination.

Despite finding Plaintiff's statements and testimony regarding her symptoms and limitations

not <u>totally</u> credible, the ALJ did give them substantial credit and gave Plaintiff the "benefit of the doubt," significantly limiting her both physically and mentally in his RFC. While the State agency physicians opined Plaintiff could work at the light exertional level, the ALJ further limited her to a range of sedentary work, performing postural movements only occasionally with no overhead reaching, with gross grasping as opposed to repetitive fine manipulation, and with no temperature extremes. Due to her headaches, depression, and pain symptoms, he limited her to unskilled, low stress, entry-level work involving one-to-two-step work processes and routine repetitive tasks, primarily working with things rather than people. (R. 25). The undersigned finds the ALJ actually limited Plaintiff more than even most of the treating and examining physicians had limited her.

The undersigned therefore finds substantial evidence supports the ALJ's RFC.

## G. Vocational Expert Testimony

Plaintiff next argues that she was diagnosed with depression, and the ALJ therefore should have relied on the VE's testimony that there would be no jobs available for an individual who had depression 1/3 to 2/3 of the time. The VE at the Administrative hearing was asked the question:

Q: If the claimant's pain affected her ability to stay on task along with the more current diagnosis of depression one-third to two-thirds of the time, would those jobs be affected.

A: The VE responded: "There would be no jobs, Your Honor for this hypothetical individual."

(R. 1223). In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. In <u>Lee v. Sullivan</u>, 945 F.2d 689 (4 th Cir. 1991), the Court addressed the issue of a limitation introduced not by the ALJ, but by counsel, finding that a

requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record."

Despite Plaintiff's pain and diagnosis of depression, the evidence does not support a finding that Plaintiff had symptoms of depression that caused her to be off task 1/3 to 2/3 of the time, as she alleges. As already found, substantial evidence supports the ALJ's determination that Plaintiff's concentration, persistence, and pace were only moderately limited. This finding was supported by Plaintiff's own examining psychiatrist who assessed her GAF as 75, which denotes only a slight impairment of functioning.

Because the evidence does not support a limitation that Plaintiff's pain and depression would cause her to be off task 1/3 to 2/3 of the time, the ALJ was not required to rely on the VE's response to a hypothetical containing that limitation.

The undersigned therefore finds substantial evidence supports the ALJ's hypotheticals to the VE and his reliance on those responses to support his determination that Plaintiff was not disabled from all jobs.

## H.  New Evidence to the Court

Along with her Motion, Plaintiff submitted to the Court a video tape she described as showing the surgery on her shoulder.  On or about July 12, 2007, as this Report and Recommendation was being prepared, Plaintiff submitted a letter and a videotape entitled "Theresa and Jimmy's Old House Before and After We Worked on It."  The accompanying letter stated that Plaintiff was submitting the tape to prove that she was a hard worker before her impairments.  It was described as showing an "old dump" she and her husband had leased, and how they had worked hard

to turn it into a "loving home." She then states she "would love to do improvements to our new home but now I am not able; I would love to go back to work, but very unfortunately I'm not able due to" impairments and pain.

It is undisputable that this evidence was submitted to the Court and was not before the Commissioner. In <u>Smith v. Chater</u>, 99 F.3d 635,(4th Cir. 1996), the Fourth circuit stated: "[I]n determining whether the ALJ's decision is supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ." The undersigned therefore cannot consider this evidence in determining whether the ALJ's decision was supported by substantial evidence.

A reviewing court may, however, remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met: 1) The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." <u>Mitchell v. Schweiker</u>, 699 F.2d 185 (4th Cir. 1983); 2) It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before him. <u>King v. Califano</u>, 599 F.2d 597 (4th Cir. 1979); <u>Sims v. Harris</u>, 631 F.2d 26 (4th Cir. 1980); 3) There must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner, 42 U.S.C. § 405(g); and 4) The claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. <u>King</u>, <u>supra</u> at 599. <u>*King*, 599 F.2d at 599</u>.

The undersigned finds the evidence does not meet the prerequisites noted above. First, Plaintiff has not shown good cause for her failure to submit the evidence when the claim was before the Commissioner. Second, the evidence is cumulative. The ALJ had before him evidence of Plaintiff's shoulder surgery as well as a subsequent health care provider's opinion that the surgery

65

should not have been done. He also had Plaintiff's argument and evidence regarding her prior ability to do physical labor and her inability to continue doing so due to her impairments. Most importantly, however, the undersigned finds the ALJ's decision would not reasonably have been different had the new evidence been before him.

The undersigned therefore finds the new evidence does not warrant remand for consideration by the Commissioner.

## V. Conclusion

As already stated, this Court's scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, "the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, supra.

The undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled, as defined in the Social Security Act, at any time through the date of his decision.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB. I accordingly recommend the Defendant's

Motion for Summary Judgment [Docket Entry 20] be **GRANTED**, Plaintiff's Motion [Docket Entry 17] be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of July, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

67